UNITED STATES of America, Appellee,

v.

Murad NERSESIAN, a/k/a "Mickey Coco," a/k/a "Mike," Elias Abdouch, a/k/a "Abu Tony," Hassan Abdul Kader Maktabi, Peter Pazienza, Abdallah Georges Machaalani, a/k/a "David," a/k/a "Davey," Hani Fraih, Antwan Abdouch, a/k/a "Tony," Ayman S. Rabadi, a/k/a "Mike," Nedam Annabi, Dennis Meade, Maysoun Annabi, and Sami Annabi, Defendants-Appellants.

Nos. 600, 606, 434, 601, 603, 602, 605, 435, 436, 604, 437 and 607; Dockets 86–1211, 86–1215, 86–1216, 86–1217, 86–1218, 86–1221, 86–1233, 86–1234, 86–1240, 86–1251, 86–1285 and 86–1287.

United States Court of Appeals, Second Circuit.

Argued Jan. 5, 1987.

Decided June 29, 1987.

Leonard J. Levenson, New York City, for defendant-appellant Elias Abdouch.

James W. Ryan, New York City, for defendant-appellant Nedam Annabi.

George R. Mayer, Bronxville, N.Y., for defendant-appellant Murad Nersesian.

Thomas H. Nooter, New York City (Freeman, Nooter & Ginsberg, New York City, of counsel), for defendant-appellant Georges Machaalani.

Joseph P. Carrozza, Yonkers, N.Y., for defendant-appellant Peter Pazienza.

Stephen Goldenberg, New York City, for defendant-appellant Hani Fraih.

Lorin Duckman, New York City, for defendant-appellant Dennis Meade.

John P. Deveney, New York City (Kellner, Chehebar & Deveney, New York City, of counsel), for defendant-appellant Hassan Abdul Kader Maktabi.

Ramsey Clark, New York City (Lawrence W. Schilling, Weldon Brewer, New York City, of counsel), for defendant-appellant Sami Annabi.

Lawrence Farkash, New York City, for defendant-appellant Ayman S. Rabadi.

. Bobbi C. Steinheim, New York City, for defendant-appellant Maysoun Annabi.

Gerald J. McMahon, New York City, for defendant-appellant Antwan Abdouch.

John M. McEnany, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Robert L. Folks and Kenneth Roth, Asst. U.S. Attys., New York City, of counsel), for appellee.

Before FEINBERG, Chief Judge,
VAN GRAAFEILAND and PIERCE,
Circuit Judges.

PIERCE, Circuit Judge:

This appeal presents numerous issues—some susceptible of summary disposition, others more complex—raised by defendants, who, together with others, were charged with and convicted of participating in a large-scale conspiracy to import heroin from the Middle East and to distribute it in the United States. Some issues apply to appellants as a group, others apply only to individual appellants. We set forth so much of the factual background as is necessary for an understanding of this appeal.

## BACKGROUND

Appellants Murad Nersesian, Elias Abdouch, Hassan Abdul Kader Maktabi, Peter Pazienza, Abdallah Georges Machaalani, Hani Fraih, Antwan Abdouch, Ayman S. Rabadi, Nedam Annabi, Dennis Meade, Maysoun Annabi, and Sami Annabi appeal their judgments of conviction in the United States District Court for the Southern District of New York (Sprizzo, *Judge*), entered after a jury trial which lasted more than five months. On March 15, 1985, the government filed an indictment charging a total of thirty-six defendants with violations of narcotics laws and related offenses in twenty-eight counts. The charges against five defendants were severed, and some of these defendants were tried separately from the appealing defendants. Some defendants were not tried because they were never apprehended. Charges against others were not prosecuted either because the charges were dismissed or because defendants negotiated pleas of guilty and entered into cooperation agreements with the government. This appeal addresses twenty-two counts of the indictment which related to sixteen defendants, twelve of whom are the appellants presently before us.[1]

Trial began on September 12, 1985 and concluded on February 19, 1986, when the jury returned its final verdict. The following are the dispositions of the various charges against appellants. All appellants on this appeal were convicted of conspiracy to distribute heroin, in violation of 21 U.S.C. §§ 846 and 841. All appellants were also convicted of conspiracy to import heroin, in violation of 21 U.S.C. §§ 963, 952, 955, and 960, with the exception of Sami Annabi, who was not charged, and Nedam Annabi, against whom the charge was dismissed. Sami Annabi was convicted of engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848. Sami Annabi, Nedam Annabi, and Murad Nersesian were found guilty of substantive narcotics offenses in violation of 21 U.S.C. §§ 812 and 841—Dennis Meade was acquitted. Sami Annabi was convicted on two counts of using a telephone to facilitate narcotics offenses, in violation of 21 U.S.C. § 843(b)—he and Murad Nersesian were found not guilty on two counts. Sami Annabi was convicted of one count of illegal receipt of a firearm, in violation of 18 U.S.C. § 922(h). Two counts charging Sami Annabi and Murad Nersesian with carrying a firearm during a crime of violence, in violation of 18 U.S.C. § 924, were dismissed. Hassan Abdul Kader Maktabi was convicted of conspiracy to defraud the United States and conspiracy to conceal material facts by causing a bank not to file currency transaction reports, in violation of 18 U.S.C. § 371. One count charging Maktabi with unlawful transportation of monetary instruments in violation of 31 U.S.C. § 5322(a) was dismissed. The charges for which each defendant was indicted, the dispositions of those charges, and the sentences imposed are also set forth in an appendix to this opinion.

The indictment charged and the evidence at trial showed the existence of a large-scale, loosely organized conspiracy to im-

---

1. The other four named defendants were Anthony Restaino, who became a fugitive after he was found guilty by the jury of conspiracy to distribute heroin, conspiracy to import heroin, and substantive possession and distribution of her-

oin, Frank Maselli and Frank Occhino, found not guilty by the jury, and Rabiha Kabakibo, acquitted at the close of the government's case pursuant to Fed.R.Crim.P. 29.

port heroin from the Middle East and a conspiracy to distribute it in the United States, particularly in the New York metropolitan area. Thus, while actually two separate conspiracies were charged and are therefore the subject of our concern, because both covered the same time frame and involved mainly the same defendants, for convenience we refer to both of these conspiracies principally as a single conspiracy to import and distribute heroin, except where the context makes clear otherwise. While we do not recount in detail the evidence adduced against each appellant, we consider it necessary to provide a broad overview of the conspiracy and a brief description of the role each appellant played in the scheme as demonstrated by the evidence.

The government's evidence consisted primarily of several accomplice witnesses who testified for the government, numerous wiretap conversations, and reports of physical surveillance by several government agents. In addition, the government introduced expert testimony about the meaning of certain wiretap conversations, as well as other documentary evidence. Four of the defendants testified in their own defense.

The evidence revealed that the conspiracy began around mid–1982 when Sami Annabi approached Basil Cannata, an accomplice who testified for the government at trial, and Anthony P. Restaino, a post-verdict fugitive, for assistance in financing a trip to the Middle East to pick up heroin. Further, with the assistance of Cannata and Restaino, Sami Annabi was able to arrange for the importation of several kilograms of heroin. Restaino, however, was later dropped from the ring, after the others concluded that he had taken advantage of them by offering too low a price for some of this heroin.

On November 23, 1982, Sami Annabi and his brother, Nedam Annabi, were arrested at John F. Kennedy International Airport while attempting to smuggle into the United States in excess of four kilograms of heroin with an average purity of eighty percent. At that time, both Sami and Nedam Annabi were charged in the Eastern

District of New York with conspiracy to import heroin into the United States, in violation of 21 U.S.C. § 963, with the substantive offense of importing heroin into the United States, in violation of 21 U.S.C. § 952(a), and with possession of heroin with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Pursuant to an agreement with the United States Attorney's Office for the Eastern District of New York, both pleaded guilty on February 4, 1983 to the importation count, and the remaining counts were dismissed at the time of sentencing. As a result of his agreement to cooperate with the Drug Enforcement Administration ("DEA") and the United States Attorney's Office for the Southern District of New York in assisting them in connection with other drug cases and his subsequent testimony for the government in three Southern District cases in 1984, Sami Annabi's original sentence of incarceration, like that of his brother, Nedam Annabi, was eventually reduced to probation.

Nevertheless, despite his arrest and agreement to cooperate with the DEA, Sami Annabi continued his heroin trafficking even while purportedly cooperating with the government. At trial, it was the government's theory that Sami Annabi and Cannata remained at the center of the drug importation operation but called upon other members of the conspiracy to take a more active role in its functioning. What follows is a brief description of the roles played by the other co-conspirators, according to the government's theory of the case.

Three suppliers in Syria, Hassan Abdul Kader Maktabi, Abu Hamadah, and Sirop Siropian constituted the source for most of the heroin delivered to Sami Annabi. Abdallah Georges Machaalani, who lived in Boston and was also involved in the importation of heroin, served as an occasional source for Sami Annabi.

In carrying out his narcotics dealings, Sami Annabi was aided by various members of his family, namely, his wife, Maysoun Annabi, his brother, Nedam Annabi, and two of his brothers-in-law, Ayman S. Rabadi and Hani Fraih. Family members

assisted in different ways. For instance, government witnesses testified, *inter alia,* that Maysoun Annabi traveled to Syria following Sami Annabi's 1982 arrest to maintain contact with a supplier and that she was involved in handling money relating to narcotics transactions; that Nedam Annabi was said to have worked on the distribution side of the conspiracy, selling heroin on a number of occasions; that Rabadi, Maysoun Annabi's brother, on one occasion assisted Cannata in picking up heroin brought into the country by couriers posing as sky marshals of Alia, the Royal Jordanian Airlines; and that Hani Fraih assisted Sami Annabi by traveling to Syria with money sewn into his coat for delivery to a supplier, by storing money in his apartment and a safe deposit box on behalf of Annabi, and by keeping a scale which belonged to Annabi in his apartment.

In addition to the Jordanian sky marshals, Angeel Abdouch, who was never apprehended, together with her son Antwan Abdouch, and her ex-husband, Elias Abdouch, were active as couriers for the Annabi conspiracy.

Both Cannata and, later, Sami Annabi himself were involved in distributing the imported heroin. Dennis Meade and Peter Pazienza assisted them on occasion by attempting to find customers for the heroin. There was testimony that Nedam Annabi and Rabadi also participated in the distribution or sale of heroin. Murad Nersesian was a customer of imported heroin. On one occasion he bought 1,300 grams of heroin from Cannata and Nedam Annabi for a price of $190,000.

All appellants except Nedam Annabi were arrested on December 18, 1984, or shortly thereafter. At that time, $138,000 in cash was found in a safe deposit box which Hani Fraih had rented with Maysoun Annabi, and another $50,050 was found in a suitcase in Hani Fraih's apartment. Approximately nine grams of heroin were found in Rabadi's residence. In addition, drug paraphernalia, records, photographs, and other evidence were seized.

Having briefly described the general functioning of the conspiracy, we now turn to a discussion of the various issues raised by this appeal.

## DISCUSSION

### I. *Single or Multiple Conspiracy*

Appellants contend that the trial evidence taken as a whole does not support the jury's verdict that there existed a conspiracy to import heroin and a conspiracy to distribute heroin, which we have referred to as a single conspiracy to import and distribute heroin. Rather, appellants argue, the evidence showed no conspiracy at all, or at most, the existence of multiple, smaller conspiracies to import and distribute heroin. For the reasons hereafter stated, we disagree.

We recently reaffirmed the oft-stated principle that "the issue of single versus multiple conspiracies is one which is committed to the province of a properly instructed jury." *United States v. Calbas,* 821 F.2d 887, 892 (2d Cir. 1987); *accord United States v. Teitler,* 802 F.2d 606, 616 (2d Cir.1986); *United States v. Cambindo Valencia,* 609 F.2d 603, 625 (2d Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980). In a charge tailored to the facts of this case, the district court instructed the jury on the issue of single versus multiple conspiracies, stressing specifically that "proof of separate conspiracies would not be sufficient to meet the government's burden on [the conspiracy counts]." Appellants do not claim error in the trial court's instruction, and we perceive of none. Accordingly, we turn to an examination of the evidence to see if it was sufficient to support the jury's finding that a single conspiracy existed as to the relevant counts. *United States v. Heinemann,* 801 F.2d 86, 91 (2d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987).

■ Viewing the evidence in the light most favorable to the government and construing all permissible inferences in its favor, as we must, *United States v. Carson,* 702 F.2d 351, 361 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 2457, 77

L.Ed.2d 1335 (1983), we conclude that there was ample evidence to support the jury's finding. The jury reasonably could have inferred from the evidence that there existed over a period of time a single conspiracy to import and distribute heroin consisting of core members who organized and oversaw the importation and distribution, family assistants, interconnected suppliers in the Middle East, couriers who actually transported the heroin, and local redistributors and customers who purchased quantities of heroin. *See United States v. Bynum,* 485 F.2d 490, 495–97 (2d Cir.1973), *vacated and remanded on other grounds,* 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974). *See generally Cambindo Valencia,* 609 F.2d at 622–25 (collecting cases involving single conspiracies).

Appellants Pazienza and Nersesian argue that the evidence showed three separate and distinct conspiracies. In their view, one extended from the initial 1982 agreement between Sami Annabi, Cannata, and Restaino and concluded when Restaino was dropped from the conspiracy. A second conspiracy began with Sami Annabi's and Cannata's agreement with the sky marshals to import heroin, involved a supplier in Union City and someone known as 'Davey' in Boston, and ended when Sami Annabi purportedly began cooperating with the DEA. A third conspiracy began on an unspecified date and ended with appellants' arrests. However, "a single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis on its locale of operations." *Cambindo Valencia,* 609 F.2d at 625. The jury need not have concluded that the same people were involved throughout the entire period of the conspiracy in order to find one conspiracy. The jury reasonably could have concluded that some members of the conspiracy charged participated throughout the entire period of the conspiracy, while others were involved in its early stages, and still others became involved in its late stages.

■ Sami Annabi argues that the evidence reveals instances of distrust, anger, and argument among appellants which are inconsistent with a single enterprise. However, it is not at all uncommon for disagreements to occur in a common enterprise. That conspirators may have problems or difficulties in dealing with one another which result in angry accusations or heated discussions does not necessarily negate the existence of a single conspiracy. *See Heinemann,* 801 F.2d at 92. The jury could have believed that any acrimony exhibited among the conspirators simply related to the common business of the single conspiracy charged.

## II. *Joinder*

■ Several appellants claim that the district court improperly denied their motions for severance. Generally, a motion to sever is addressed to the sound exercise of the trial court's discretion. *United States v. Arocena,* 778 F.2d 943, 949 (2d Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1281, 89 L.Ed.2d 588 (1986). A district court's denial of a motion to sever will be reversed only upon a showing of a clear abuse of discretion. *United States v. Cody,* 722 F.2d 1052, 1061 (2d Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 873 (1984). To establish such an abuse an appellant must successfully bear "the heavy burden of showing that he suffered substantial prejudice due to the joint trial, amounting to a miscarriage of justice." *United States v. Bari,* 750 F.2d 1169, 1177 (2d Cir.1984) (citations omitted), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985).

Nevertheless, the appellant's heavy burden notwithstanding, we are not unaware of the dangers of prejudice inherent in large conspiracy trials. In cases where many defendants are tried at once under a single conspiracy theory, we continue to stress the importance of the district court's giving special cautionary instructions, as was done herein, to ensure that each individual defendant receives a fair trial based on the charges and evidence fairly attributable to him.

■ Bearing this in mind, we turn to an examination of appellants' specific claims. Those appellants who played rela-

tively lesser roles in the conspiracy, such as appellants Pazienza, Nersesian, and Machaalani, claim that the evidence offered against them was minimal in comparison to that offered against other defendants, and that therefore they were exposed to testimony that did not relate directly to them. This exposure, they argue, created a prejudicial spillover effect such that the jury did not focus on the evidence that concerned only them. However, as noted, see section I, *supra,* the evidence was sufficient to support the jury's conclusion that all defendants participated in a single conspiracy. The government was therefore entitled to show the entire range of evidence of the conspiracy against each appellant. We are unaware of any evidence offered to prove conspiracy that was admitted at the joint trial which would have been inadmissible at an individual trial. *See United States v. Cunningham,* 723 F.2d 217, 230 (2d Cir.1983), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 540 (1984). That one appellant's role in the conspiracy may have been smaller or less central than that of certain other co-conspirators does not mandate a separate trial. *United States v. Vega,* 458 F.2d 1234, 1236 (2d Cir.1972), *cert. denied,* 410 U.S. 982, 93 S.Ct. 1506, 36 L.Ed.2d 177 (1973). As we have previously said, "differences in degree of guilt and possibly degree of notoriety" of defendants do not require that there be separate trials. *United States v. Aloi,* 511 F.2d 585, 598 (2d Cir.), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386 (1975).

Sami Annabi's objections to the joint trial present us with an interesting variation of a claim of prejudicial spillover. More often than not, the issue of severance arises in cases where a defendant fears that strong evidence against co-defendants may have spillover effect against him. In this case, however, Sami Annabi claims spillover prejudice because the evidence directly involving him was stronger than the evidence directly involving the other defendants. Sami Annabi acknowledges that he was the centerpiece of the government's conspiracy claim, the one alleged to be the mastermind of the importation and distribution network. Such being the case, Annabi claims

that other defense counsel, and on occasion even the court, assumed his guilt and spoke and conducted themselves based on that assumption. In sum, Annabi argues that "it was impossible for [him] to obtain a fair trial in the face of the prejudicial joinder which created a near irrebuttable presumption of his guilt."

We acknowledge that a defendant properly joined at the start of a trial may have to be severed during trial to protect adequately against spillover prejudice. A district court has a continuing duty to protect a defendant from substantial prejudice resulting from improper joinder and to consider whether severance is necessary. *See Cambindo Valencia,* 609 F.2d at 629. However, there is no per se rule that when evidence against a defendant is strong, severance is mandated. It would be an anomalous rule that would allow joinder of a defendant where evidence against him is considered weak and he fears prejudicial spillover but that would not permit joinder where evidence against that defendant is considered strong. In either instance, the test remains the same, whether the prejudice resulting from joinder is sufficiently great to mandate severance in order to assure a fair trial. In this case, there is little doubt that the government's evidence against Sami Annabi is strong. However, we do not believe a showing has been made of prejudice so substantial that it can be said that a "miscarriage of justice" resulted, *Bari,* 750 F.2d at 1177.

We have carefully reviewed all the instances cited by Sami Annabi which he asserts support his claims of prejudice. Most of these instances relate to references in which either the court or defense counsel mentioned the abundant evidence against Sami Annabi in the course of argument on various motions outside the presence of the jury. As for remarks that were made in the presence of the jury, in our view, they fall far short of demonstrating the necessary prejudice that would require severance. For instance, Annabi claims that during the opening statements of defense counsel, one attorney stated that "the evidence will be overwhelming" and another

referred to "strong evidence," but both emphasized that the evidence did not pertain to their clients. Neither attorney mentioned Sami Annabi by name nor in any way implied that they were referring to him. One said, "as against *some people* ... the evidence will be overwhelming (emphasis added);" the other said, there may be "strong evidence against *certain suspects*" (emphasis added). Other examples of prejudice cited by Annabi are similarly without merit. On two occasions during the questioning of the expert witness, Nolan, see section IV, *infra,* the court asked Nolan to state the basis of his (Nolan's) opinion that Annabi was dealing in heroin; contrary to Annabi's assertion, the court did not imply that it agreed with that opinion. On other occasions defense counsel, cross-examining Sami Annabi, referred to Annabi's cocaine usage; however, such usage was entirely consistent with Annabi's defense that part of his conduct could be explained by reference to his personal cocaine usage. Accordingly, we conclude that the district court did not abuse its discretion in denying Sami Annabi's and the other appellants' motions for severance.

### III. *Admission of the Wiretap Evidence*

The government introduced into evidence numerous transcriptions of conversations intercepted via wiretaps. The wiretap evidence, taken together with expert testimony which interpreted it, see section IV, *infra,* was a crucial element of the government's case. Appellants, and specifically Sami Annabi, claim that the wiretap evidence was improperly admitted.

 Sami Annabi first challenges the admission into evidence of conversations intercepted over the phones of Saverio Schifano and Rafaela Soto, co-conspirators who pleaded guilty to the charges brought against them. Initially, we note that no appellant has standing to contest the Schifano and Soto wiretaps because no appellant was named in the wiretap orders, and none of appellants' conversations were intercepted over these wiretaps. *United*

States v. Salerno, 794 F.2d 64, 70 (2d Cir. 1986), *rev'd on other grounds,* —— U.S. ——, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); *United States v. Fury,* 554 F.2d 522, 525–26 (2d Cir.), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977). Although Sami Annabi was listed in an order which extended the Schifano wiretap, he does not point to, nor are we aware of any information resulting from that extension order which was introduced into evidence.

 Moreover, even assuming *arguendo* that appellants do have standing to contest the validity of the Schifano and Soto wiretap orders, their objections are without merit. The applications for the Schifano and Soto wiretaps set forth in detail the limitations of other investigative techniques thereby meeting the requirements of 18 U.S.C. §§ 2518(1)(c) and (3)(c). Furthermore, the district court's carefully considered conclusion, with which we agree, that the wiretaps were properly obtained is entitled to deference by a reviewing court. *See United States v. Wilkinson,* 754 F.2d 1427, 1433 (2d Cir.), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). Annabi's complaint that the issuing judge was not adequately apprised of Annabi's suspected involvement in the conspiracy, as required by 18 U.S.C. §§ 2518(1)(b) and (e), was not raised in the district court and is therefore waived. *See United States v. Lanza,* 790 F.2d 1015, 1021 (2d Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986). Finally, Annabi's complaints that the government did not properly comply with the wiretap sealing requirements, 18 U.S.C. § 2518(8)(a), are without merit. The initial Schifano wiretap order expired on October 13, 1984, whereupon further interception was interrupted until October 17 when an extension order was issued. The government's submission of the tapes from the initial wiretap on October 17, four days after the expiration of the initial order, was timely because sealing is required only after "the expiration of the period of the order, *or extensions thereof,*" 18 U.S.C. § 2518(8)(a) (emphasis added). The brief gap between the termination of the first wiretap order and the issuance of the sec-

ond does not prevent the latter from being an extension of the former. *See United States v. Vazquez,* 605 F.2d 1269, 1277–78 (2d Cir.), *cert. denied,* 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979). Also, § 2518(8)(a), which requires the issuing judge to seal any recordings obtained pursuant to a wiretap order, was not violated simply because the Schifano wiretap recordings were submitted for sealing to a judge (Judge Sand) other than the issuing judge (Judge Wyatt). Judge Wyatt signed the initial Schifano wiretap order "at Part I in the absence of Judge Sand attending the Judicial Conference" and requested that all further matters relating to the wiretap be submitted to Judge Sand. Under these circumstances, the sealing was proper. *See Vazquez,* 605 F.2d at 1280 n. 25.

Sami Annabi also challenges the validity of the wiretap that was placed on his own telephone. That wiretap, which was placed pursuant to a New York State court order obtained on October 19, 1984 and extended twice thereafter, authorized both state and federal agents to engage in interception of conversations under those orders. Annabi's principal contention on appeal is that the government did not properly establish probable cause.

The standard of probable cause for the issuance of a wiretap "is the same as the standard for a regular search warrant." *Fury,* 554 F.2d at 530. " '[O]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.' " *Illinois v. Gates,* 462 U.S. 213, 235, 103 S.Ct. 2317, 2330, 76 L.Ed.2d 527 (1983) (quoting *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969)). A determination of probable cause, which is generally paid great deference by reviewing courts, will be upheld as long as there existed a substantial basis for a magistrate or judge to conclude that a search would uncover evidence of wrongdoing. *Id.* at 236, 103 S.Ct. at 2331.

Probable cause for the wiretap on Annabi's telephone was established from several sources. The government's affidavit in support of its application for a wire-

tap order included, among other evidence, that the New York State authorities had information from one Gerry Mullahey who told them that he had been present at Sami Annabi's residence when Joseph Vataj and Sami Annabi were handling a garbage bag full of heroin. In addition, a wiretap placed on Vataj's phone revealed a series of telephone calls between Annabi and Vataj in which they arranged meetings. Mullahey had told the state police that the purpose of these meetings was to discuss or transact drug deals. Moreover, the application also recounted Schifano's heroin sale to an undercover agent and summarized a series of narcotics-related calls leading up to a meeting between Schifano and Cannata to discuss a heroin deal, after which Cannata was observed driving directly to Sami Annabi's residence. In our view, these facts provided the state court with more than a substantial basis to conclude that a wiretap on Annabi's telephone would uncover evidence of wrongdoing. *Gates, Id.* at 236, 103 S.Ct. at 2331.

We need not address Annabi's claim that the government violated a cooperation agreement, which Annabi had entered into with the DEA, by relying in its affidavit on testimony Annabi had provided as a cooperating witness in other drug cases, in which he acknowledged importing heroin on a number of occasions in 1982 and 1983. Pursuant to the cooperation agreement, the government agreed that anything Annabi told the government would not be used against him so long as the information and testimony he provided was full and complete and he ceased his drug dealing. Even if Annabi's statements were improperly included in the government's affidavit, nevertheless, the remaining information, considered independently, plainly established probable cause. *See United States v. Ferguson,* 758 F.2d 843, 849 (2d Cir.), *cert. denied,* 474 U.S. 841, 106 S.Ct. 124, 88 L.Ed.2d 102 & 474 U.S. 1032, 106 S.Ct. 592, 88 L.Ed.2d 572 (1985).

Annabi also claims that there was insufficient evidence to establish probable cause to support the Vataj wiretap order pursuant to which information used in the

Annabi wiretap application was obtained. We disagree. That application contained evidence, *inter alia*, that a confidential informant working with the state police, who had previously provided reliable information, had called Vataj and had a series of narcotics-related conversations, some concerning cocaine. Moreover, some of these calls were consensually recorded and the state police independently determined them to be narcotics-related, thus obviating any need to rely on the informant's credibility.

Finally, Sami Annabi argues that the minimization requirements of 18 U.S.C. § 2518(5) were not followed with respect to the wiretap on his phone, thus causing many clearly innocent calls, often involving husband and wife, to be intercepted. Sami Annabi's motion attacking the efforts to minimize the interception of nonpertinent conversations over his telephone as inadequate was not made until well after the conclusion of the trial and was properly rejected by the district court as untimely. *See, e.g., United States v. Jimenez,* 789 F.2d 167, 169–70 (2d Cir.1986). Moreover, other defendants' timely pretrial suppression motions on minimization grounds were carefully considered by the district court and rejected on the merits. That determination appears to be proper when considered in light of the factors set forth in *Scott v. United States,* 436 U.S. 128, 140–41, 98 S.Ct. 1717, 1724–25, 56 L.Ed.2d 168 (1978), for assessing whether surveillance agents acted reasonably in minimizing intercepted conversations. The instant case involved factors such as the presence of ambiguous or coded language, a conspiracy thought to be widespread, and the fact that the phone tapped was located in the residence of a person thought to be the head of a major drug ring, all of which tend to justify extensive surveillance. We cannot conclude that in monitoring the intercepted conversations, the investigators did not "observe reasonable safeguards against excessive intrusion," *United States v. Terry,* 702 F.2d 299, 312 (2d Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983), such as to amount to a violation of the minimization requirement.

## IV. *Expert Testimony*

As noted above, part of the government's trial evidence consisted of the introduction of numerous intercepted telephone conversations. The government contended that these conversations contained coded language which was related to narcotics. In support of this contention, the government called, as the final witness in its case-in-chief, DEA agent John Nolan to testify as an expert concerning the meaning of various wiretap conversations. The district court found that Agent Nolan was qualified to testify as an expert regarding drug codes on the basis of his fifteen years of drug investigatory experience, which included participation in 125 wiretap investigations, one of which involved Arabic-language conversations. Prior to testifying in this case, Agent Nolan had already been qualified at least three times as an expert on the use of codes by narcotics traffickers.

On direct-examination, Agent Nolan, who had read most of the voluminous English transcripts of tape recordings that had been played for the jury but had not actually listened to the Arabic tapes themselves, drew upon his specialized knowledge and experience to explain patterns of speech and language that, in his experience, narcotics dealers commonly use in their conversations. For instance, he pointed out that caution, pauses, excessive use of pronouns, and the participants' apparent knowledge of what they were talking about were indicia that could be relied upon in assessing whether a conversation was drug-related. He also identified certain key words or phrases used in certain intercepted conversations as narcotics-related. For instance, he testified that, depending on the context, words such as cheese, land, room, house, car, horse, and stick-shift, could carry a hidden meaning related to narcotics. The district court specifically directed that Agent Nolan limit his testimony to an analysis of the telephone calls, without reference to other evidence in the case. Accordingly, on direct-examination, Agent Nolan phrased his testimony in terms of whether a conversation was "nar-

cotics-related," rather than specifying whether it was "heroin-related" or "cocaine-related," except in those cases in which intrinsic evidence, such as prices mentioned by the conversants, established the topic of conversation to be heroin.

On cross-examination, Agent Nolan was asked numerous questions by defense counsel that referred specifically to heroin or cocaine and was called upon to identify which of those two drugs was the topic of certain conversations. Responding to such questions, Agent Nolan stated his opinion that certain of the conversations about which he was asked related specifically to heroin. During the third day of cross-examination, the district court intervened to restrict Nolan's testimony. The district court determined that Nolan's responses as to what type of narcotics a code referred to went beyond the fair scope of Nolan's expertise. The judge stated, "I think he can only testify that [a code] is narcotics related .... I think this witness is usurping the jury's function if he says, based upon all the evidence in the case, all the conversations he read, Annabi was selling heroin and therefore these conversations relate to heroin." The judge limited cross-examination accordingly, and instructed the jury strictly and at length that the jury could consider the expert testimony only as it related to the use and interpretation of codes in narcotics-related transactions, but not, except in those instances in which price or some other peculiar indicia of the specific narcotics was mentioned, as to what drug, heroin or cocaine, was involved. Defense motions for a mistrial and to strike Nolan's entire testimony were denied by the district court.

Appellants now contend that Agent Nolan's testimony was unduly prejudicial. Specifically, they argue that even assuming there was enough evidence to show that defendants engaged in activities involving narcotics, there was insufficient evidence to establish that the drug involved was heroin, as charged in the indictment, and not some other substance. Agent Nolan's opinion testimony that defendants were speaking specifically of heroin went to an element of the government's case, proof of

which, in appellant's view, was clearly deficient, making his testimony fatally prejudicial. We do not agree.

It is well settled that the decision whether to admit expert testimony under Fed.R.Evid. 702 is vested in the broad discretion of the trial court, and that decision will be sustained unless manifestly erroneous. *United States v. Cruz*, 797 F.2d 90, 96 (2d Cir.1986). Moreover, it is well established that the operations of narcotics dealers are a proper subject for expert testimony under Fed.R.Evid. 702. *Id.* In the past, we have upheld the admission of expert testimony to explain the use of narcotics codes and jargon in intercepted conversations. *E.g., United States v. Ginsberg*, 758 F.2d 823, 830 (2d Cir.1985); *United States v. Cirillo*, 499 F.2d 872, 881 (2d Cir.), *cert. denied*, 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974). We acknowledge some degree of discomfiture in cases such as the instant one in which this practice is employed, since, uncontrolled, such use of expert testimony may have the effect of providing the government with an additional summation by having the expert interpret the evidence. *See United States v. Brown*, 776 F.2d 397, 401 (2d Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986). In fact, in this case, the district judge recognized the danger that an expert may come dangerously close to usurping the jury's function. Nevertheless, a district court's decision to allow an expert to testify will not be overturned lightly. In this case, we perceive no error in the district court's decision to allow the government to elicit expert testimony from a properly qualified expert witness regarding the parlance of the narcotics trade and the meaning thereof. The district court's decision to allow Agent Nolan to testify was within the wide latitude provided by Fed.R.Evid. 702.

Appellants' contention that they were irreparably prejudiced by the specific drug references to heroin and cocaine that they elicited from Agent Nolan on cross-examination must be rejected. First, as we have noted, on direct-examination, the dis-

trict court was careful to limit the testimony of Agent Nolan, and Nolan testified in general terms that certain calls were or were not narcotics-related. It was defense counsel who opened the door and sought to broaden the scope of Nolan's testimony by making inquiries which related to specific drugs. Appellants can hardly complain about the residual detrimental effects resulting from two days of inquiry on cross-examination, since they elicited the testimony in the first place. *Cf. United States v. Jones*, 763 F.2d 518, 524 (2d Cir.) (conviction affirmed despite presence of alternate jurors during deliberations when their presence was requested by defendants), *cert. denied*, 474 U.S. 981, 106 S.Ct. 386, 88 L.Ed.2d 339 (1985); *United States v. Ferguson*, 758 F.2d 843, 851–52 (2d Cir.) (conviction on lesser charge affirmed when defendants requested lesser charge for which they had not been indicted), *cert. denied*, 474 U.S. 841, 106 S.Ct. 124, 88 L.Ed.2d 102 & 474 U.S. 1032, 106 S.Ct. 592, 88 L.Ed.2d 572 (1985). Defense counsel having broadened the scope of Nolan's testimony, the district court, responsible for keeping the testimony from exceeding appropriate evidentiary limits, restricted Nolan's testimony on further cross-examination. Moreover, the district court's strict and thorough limiting instructions to the jury were sufficient to cure any possible prejudice which may have resulted from Nolan's earlier specific drug references. *See United States v. Young*, 745 F.2d 733, 761 (2d Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985). We, therefore, reject appellants' claims of prejudice.

## V. *Maktabi's "Money Laundering" Conspiracy*

Count Four of the indictment alleged that one of the appellants, Hassan Abdul Kader Maktabi, and other co-conspirators, not appellants herein, engaged in a conspiracy to convert in excess of $117,000 in cash into money orders and travelers checks in violation of 18 U.S.C. § 371. Section 371 has two separate prongs: it is a crime under § 371 to "conspire ... to commit any offense against the United States, *or* to defraud the United States, or any agency thereof in any manner or for any purpose." *Id.* (emphasis added). Maktabi was charged under § 371 both with conspiracy to defraud the United States or an agency thereof, specifically the Internal Revenue Service ("IRS"), by depriving the IRS of information to which it was entitled, and with conspiracy to commit a substantive offense, namely, to violate 18 U.S.C. § 1001. Section 1001 makes it a crime to "knowingly and willfully falsif[y], conceal[ ], or cover[ ] up by any trick, scheme, or device a material fact" in any matter within the jurisdiction of any department or agency of the United States. *Id.*

Specifically, the indictment alleged that Maktabi and his co-conspirators agreed to convert U.S. currency in an amount over $117,000 into money orders and travelers' checks. According to the government's theory, these purchases, each individually in an amount under $10,000, were undertaken at several different banks and bank branches over a period of days for the purpose of keeping the banks from submitting the Currency Transaction Reports ("CTRs") that banks are required to file with the IRS in connection with transactions in currency exceeding $10,000 in a single day. For instance, the trial evidence showed that Maktabi and others purchased at various branches of the Chase Manhattan Bank in New York City approximately $23,000 worth of money orders on December 13, 1984, approximately $30,000 on December 14, and approximately $20,000 on December 17. All these money orders were purchased in $1,000 denominations. Of the $23,000 converted on December 13, $11,000 was purchased at the same branch in eleven separate $1,000 money orders. The other $12,000 was purchased at various other branches of the Chase Manhattan Bank. Other money orders were purchased in a similar manner at other banks in New York City, including the Anchor Savings Bank, Citibank, and Chemical Bank on these and other dates during December 1984. None of the banks filed

CTRs with regard to the purchase of any of these money orders.

Maktabi argues on appeal, first, that the statutory and regulatory framework which requires the submission of CTRs by banks has no provision for imposition of criminal liability on a bank customer, including one who engages in transactions in an overall amount exceeding $10,000 but where none of the transactions individually exceeds $10,000, and where, as a consequence, the bank is unaware that a CTR should be filed. Second, he contends that even if such a substantive crime does exist, the evidence was insufficient to show that he had the requisite specific knowledge that banks are required to report to the government currency transactions over $10,000. In our view, the indictment properly charged a conspiracy to defraud the United States under § 371 as well as a conspiracy to violate § 1001, and the evidence was sufficient to support Maktabi's conviction.

### A. Existence of Crimes Charged

The Bank Secrecy Act (the "Act"), 31 U.S.C. § 5311 *et seq.*, requires the making and keeping of "certain reports or records [which] have a high degree of usefulness in criminal, tax or regulatory investigations or proceedings." 31 U.S.C. § 5311. Section 5313 authorizes the Secretary of the Treasury to require domestic financial institutions, and any other participants in transactions for the payment, receipt, or transfer of United States currency, to report those transactions to the Secretary.[2] Under the regulations issued by the Secretary, only financial institutions are required to file these reports for transactions involving more than $10,000. 31 C.F.R. § 103.-

22(a).[3] The CTR itself (IRS Form 4789) calls for, among other things, the name and address of the person conducting the transaction, and the name and address of such person, if any, for whom the transaction was completed. Criminal penalties for willful violation of the statute or regulations are set forth in 31 U.S.C. § 5322.

Initially, we note that other circuits are divided on the question whether a *bank customer* can be prosecuted under the substantive provisions of the Act, 31 U.S.C. §§ 5313, 5322, 18 U.S.C. § 1001 (concealment of a material fact), and 18 U.S.C. § 2(b) (causing another to commit an offense against the United States), for causing a bank to fail to file a CTR by not disclosing the structured nature of currency transactions. The Eleventh Circuit has adopted a position, termed "a sensible, substance-over-form approach in dealing with schemes to circumvent financial institution reporting requirements," *United States v. Tobon-Builes*, 706 F.2d 1092, 1098 (11th Cir.1983) (citing *United States v. Thompson*, 603 F.2d 1200 (5th Cir.1979)). It holds that "where a person causes a financial institution not to report currency transactions that it had a duty to report, the person is guilty of the substantive offense." *United States v. Puerto*, 730 F.2d 627, 631 (11th Cir.) (citing *Tobon-Builes*), *cert. denied*, 469 U.S. 847, 105 S.Ct. 162, 83 L.Ed.2d 98 (1984); *see also United States v. Cure*, 804 F.2d 625, 627 (11th Cir.1986) (per curiam); *United States v. Giancola*, 783 F.2d 1549, 1552–53 (11th Cir.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 669, 93 L.Ed.2d 721 (1987); *United States v. Denemark*, 779 F.2d 1559, 1563 (11th Cir.1986); *United States v. Sans*, 731

---

**2.** 31 U.S.C. § 5313(a) states:

(a) When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes. A participant acting

for another person shall make the report as the agent or bailee of the person and identify the person for whom the transaction is being made.

**3.** 31 C.F.R. § 103.22(a) provides in pertinent part:

(a) (1) Each financial institution other than a casino shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution, which involves a transaction in currency of more than $10,000.

F.2d 1521, 1531 (11th Cir.1984), *cert. denied,* 469 U.S. 1111, 105 S.Ct. 791, 83 L.Ed.2d 785 (1985). On the other hand, the First, Eighth, and Ninth Circuits have adopted the position that since the Act and regulations promulgated thereunder do not impose a duty on a bank customer to disclose his transactions to the government either directly or through the financial institution, there can be no substantive violation of the Act or violation of §§ 2(b) or 1001 by a bank customer. *United States v. Larson,* 796 F.2d 244, 246 (8th Cir.1986); *United States v. Varbel,* 780 F.2d 758, 762 (9th Cir.1986); *United States v. Anzalone,* 766 F.2d 676, 682–83 (1st Cir.1985); *see also United States v. Reinis,* 794 F.2d 506, 508 (9th Cir.1986); *United States v. Della Espriella,* 781 F.2d 1432, 1435 (9th Cir. 1986).

In this circuit, we have held that an individual, although under no legal responsibility himself to file a CTR, nevertheless, can be criminally liable under 18 U.S.C. § 2(b) for causing a financial institution to fail to file a currency transaction report which it had a legal duty to file. *United States v. Heyman,* 794 F.2d 788 (2d Cir. 1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 585, 93 L.Ed.2d 587. *Heyman* involved a Merrill Lynch employee, Alan Heyman, who structured his customer's deposits so that no single transaction involved an amount greater than $10,000. By doing so, Heyman willfully caused Merrill Lynch to fail to file the appropriate CTRs. Under the facts of that case, we held that had Merrill Lynch, a financial institution, structured the transactions as Heyman did, it would have violated the federal laws requiring the filing of CTRs, namely, 31 U.S.C. §§ 5313 and 5322. Accordingly, since 18 U.S.C. § 2(b) holds liable as a principal any person (Heyman) who willfully causes an act to be done which if directly performed by another (Merrill Lynch) would be a federal offense, Heyman was criminally liable for a violation of 31 U.S.C. §§ 5313 and 5322.

*Heyman,* however, is only applicable in this case by analogy because it involved a prosecution under the Act and 18 U.S.C. § 2(b), crimes not charged here. The ques-

tions presented here are whether an individual bank customer can be charged with a violation of either § 371, conspiracy to defraud the United States, or § 371, conspiracy to violate § 1001, concealment of a material fact. The district court charged the jury herein under both prongs of § 371 and the jury returned a general verdict of guilty. We now examine each prong of § 371 not only for sufficiency of evidence but also to see if they state cognizable conspiracy offenses, assuming without deciding that it is necessary for us to do so, *see Stromberg v. California,* 283 U.S. 359, 367–68, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931); *United States v. Peterson,* 768 F.2d 64, 67–68 (2d Cir.), *cert. denied,* 474 U.S. 923, 106 S.Ct. 257, 88 L.Ed.2d 264 (1985); *United States v. Murray,* 618 F.2d 892, 898–99 (2d Cir.1980); *United States v. Natelli,* 527 F.2d 311, 324–25 (2d Cir.1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976).

We turn first to the legal sufficiency of that part of Count Four of the indictment which charged a conspiracy to violate § 1001. Reading the pertinent statute and regulations, it seems clear from the face of each that a *bank customer* is not required to file a CTR for any banking transaction; only financial institutions are required to file reports. Although section 5313 extends its coverage to the financial institution and *any other participant in the transaction* and, thus, the Secretary of the Treasury could have required not only banks to file reports, but also, bank customers, or participants other than financial institutions, nevertheless, 31 C.F.R. § 103.-22 limits the reporting requirement to . financial institutions *only.* See *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 58, 69–70 & n. 29, 94 S.Ct. 1494, 1521, 1521–22 n. 29, 39 L.Ed.2d 812 (1974). Courts that have considered this statutory and regulatory scheme are in agreement that there is no duty on bank customers themselves to file reports with the government of any transactions. *Heyman,* 794 F.2d at 791; *accord Larson,* 796 F.2d at 246; *Varbel,* 780 F.2d at 761–62; *Anzalone,* 766 F.2d at 681; *Tobon-Builes,* 706 F.2d at 1097.

It also seems clear from the statute and regulations that the requirement to file a CTR depends on a transaction occurring at a single financial institution. The statute speaks of *"a* domestic *financial institution"* being involved in *"a transaction* for the payment, receipt, or transfer of United States coins or currency." 31 U.S.C. § 5313 (emphasis added). Thus, no obligation to file a CTR arises where a customer structures his transactions, each under $10,000, at different financial institutions. *See Denemark,* 779 F.2d at 1562–63. Similarly, transactions occurring on different days at the same financial institution are not aggregated to constitute a single transaction so that a bank would have to file a CTR. *Heyman,* 794 F.2d at 792; *Reinis,* 794 F.2d at 508. We need not address whether transactions on the same day, each under $10,000 at different branches of the same bank totalling over $10,000, trigger a bank's CTR filing requirement. *See Giancola,* 783 F.2d at 1552 (CTR requirement triggered). *But see id.* at 1554 (dissenting opinion). In this case, at least on one day, December 13, 1984, Maktabi and his associates procured $11,000 in $1,000 money orders at the same branch of one financial institution.

■ Thus, one fundamental question that we face is whether a bank customer can be liable for a violation of § 1001, concealment of a material fact, where that customer is under no duty to file a CTR with the government. Generally, a defendant cannot be prosecuted under § 1001 for concealing material facts unless he had a duty to disclose the material facts at the time he was alleged to have concealed them. *United States v. Irwin,* 654 F.2d 671, 678 (10th Cir.1981), *cert. denied,* 455 U.S. 1016, 102 S.Ct. 1709, 72 L.Ed.2d 133 (1982). While it is true that Maktabi had no duty himself to file CTRs with the government, it is not disputed that a bank is required to file a CTR for a single transaction in excess of $10,000 received on a single day. Had the bank intentionally structured the transactions as Maktabi did, splitting up large sums into blocks of less than $10,000 in order to avoid the filing of a CTR, it surely would have violated the

Act as well as been guilty of concealing a material fact in violation of § 1001. *Heyman,* 794 F.2d at 791; *see also Puerto,* 730 F.2d at 632–33; *Tobon-Builes,* 706 F.2d at 1099. Under 18 U.S.C. § 2(b), a bank customer has a duty not to willfully cause a bank to violate the Act or to conceal material facts from the IRS. *Heyman,* 794 F.2d at 791–92. Had Maktabi been charged here with a substantive violation of § 1001, he could have been held liable under § 1001 by application of § 2(b). *Id.* Here Maktabi is not charged with a substantive violation of § 1001, but with conspiracy to violate § 1001. It a crime to conspire to cause another to commit a crime. *United States v. Perry,* 643 F.2d 38, 45 (2d Cir.), *cert. denied,* 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981). This is true, even where, as here, "the indictment and the jury instructions do not spell out in so many words" that the defendant could be found guilty of conspiracy to cause another to commit a crime, as long as "all the elements necessary [to find a conspiracy to cause another to commit a substantive offense] were fairly put to the jury." *Id.* In sum, not only is it a crime to conspire to violate § 1001, but it is also a crime to conspire to cause another to violate § 1001. Thus, bank customers who intentionally and with knowledge of the reporting requirements structure their transactions so as to circumvent or prevent a bank from complying with those requirements commit a crime. Herein, Maktabi is charged with conspiring to divide up the total amounts involved in the subject currency exchanges so that they did not exceed $10,000, in order to cause the bank to fail to file a CTR, and thus to conceal material facts from a government agency. An agreement to divide a large transaction in excess of $10,000 into a series of smaller ones each below $10,000 can constitute an unlawful agreement to "conceal or cover up by ... trick, scheme, or device" the material fact that the transaction involved a sum totalling more than $10,000. In our view, Maktabi was properly charged with a conspiracy to violate § 1001 by causing a bank to conceal material facts from the IRS. *See*

*Puerto*, 730 F.2d at 632; *Tobon-Builes*, 706 F.2d at 1099; *United States v. Richter*, 610 F.Supp. 480, 487 (N.D.Ill.1985), *aff'd without opinion*, 793 F.2d 1296 (7th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 191, 93 L.Ed.2d 124 (1986).

We turn next to the legal sufficiency of that part of Count Four of the indictment which charged a conspiracy to defraud. A conspiracy to defraud under § 371 embraces "any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of Government." *Dennis v. United States*, 384 U.S. 855, 860–61, 86 S.Ct. 1840, 1843–44, 16 L.Ed.2d 973 (1966) (quotations and citations omitted). It is well established that the term "defraud" as used in § 371 not only reaches schemes which deprive the government of money or property, but also is designed to protect the integrity of the United States and its agencies. *United States v. Johnson*, 383 U.S. 169, 172, 86 S.Ct. 749, 751, 15 L.Ed.2d 681 (1966). Thus, the crime of conspiracy to defraud the United States includes acts that interfere with or obstruct one of its lawful governmental functions by deceit, craft, or trickery, or by means that are dishonest. *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924); *United States v. Turkish*, 623 F.2d 769, 771 (2d Cir.1980), *cert. denied*, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981).

The Supreme Court has recognized the importance to the government of having financial institutions provide the Secretary of the Treasury with reports of sizeable currency transactions by their customers. *See Shultz*, 416 U.S. at 26–27, 94 S.Ct. at 1500. For instance, one purpose for the filing of CTRs is to ferret out criminal activity. *Id.* at 27, 94 S.Ct. at 1500. The regulations emphasize the important purposes behind the filing of CTRs by stating that "[t]he Secretary hereby determines that the records required to be kept by this subpart have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." 31 C.F.R. § 103.31.

It is our view that, to be held liable under the broad sweep of the fraud prong of § 371, defendants need not have agreed to commit, or have actually committed, a specific substantive offense. They merely must have agreed to interfere with or to obstruct one of the government's lawful functions. *See United States v. Southland Corp.*, 760 F.2d 1366, 1382 (2d Cir.1985), *cert. denied*, 474 U.S. 825, 106 S.Ct. 82, 88 L.Ed.2d 67 (1986). Thus, the fact that Maktabi, as an individual bank customer, had no duty to report transactions over $10,000 is not the operative issue as to whether he agreed to unlawfully defraud the United States by impairing and obstructing its lawful governmental functions of collecting data and reports of currency transactions in excess of $10,000. The IRS has an interest in receiving CTRs from financial institutions when customers arrange transactions in excess of $10,000. In order for this lawful governmental function to operate, it is imperative that reports be submitted by financial institutions. If Maktabi and his associates agreed to interfere with and to obstruct this lawful function of the IRS, they could properly be charged with a violation of the "defraud prong" of § 371. *See Puerto*, 730 F.2d at 630–31; *Sans*, 731 F.2d at 1533–35; *Richter*, 610 F.Supp. at 485.

Having concluded that Maktabi was properly charged with a crime under both prongs of § 371, conspiracy to violate § 1001 and conspiracy to defraud the United States, we must still determine whether there was sufficient evidence to support his conviction.

## B. Sufficiency of the Evidence

Maktabi does not dispute, and there was ample evidence at trial, including the testimony of surveillance agents and bank tellers, as well as exhibits of bank records, to show that Maktabi and his associates actually converted large amounts of cash into money orders and travelers' checks in varying amounts under $10,000 between December 13, 1984 and December 17, 1984. However, Maktabi does dispute that there was sufficient evidence to prove that he specifically knew of the reporting

requirements and, with that knowledge, deliberately sought to avoid its strictures by buying money orders in less than the triggering amount in related transactions. To find a defendant guilty of a conspiracy involving a willful currency transaction violation, the government must prove that the defendant had specific knowledge of the reporting requirements and intended to cause them to be evaded. *See United States v. DiTommaso*, 817 F.2d 201 (2d Cir.1987); *United States v. Dichne*, 612 F.2d 632, 636 (2d Cir.1979), *cert. denied*, 445 U.S. 928, 100 S.Ct. 1314, 63 L.Ed.2d 760 (1980). The district court properly charged the jury that to find Maktabi guilty of either a conspiracy to defraud or a conspiracy to conceal a material fact, it had to find that he knew there was a reporting requirement for currency transactions in excess of $10,000 and intended to evade that requirement.

Maktabi points to a number of facts that in his view show that he did not have actual knowledge of the currency reporting requirement. He claims that there was no pattern whatever in the amounts purchased and no series of purchases just short of the reporting minimum, which might have allowed for the inference of knowledge; that there was no evidence that he was told early on by a bank teller or by anyone else of the reporting requirements; and that there was no evidence that banks had signs or notices posted informing purchasers of the law. Moreover, he points to an episode which occurred on December 17, 1984, the last day on which Maktabi purchased money orders, which, in his view, provides conclusive evidence that he did not know of the currency transaction reporting laws. On that day, one of his associates entered a Chase Manhattan Bank branch, armed with $10,000 in cash that Maktabi had supplied, and asked to buy a single money order. When the teller responded by asking for the information needed for a CTR, appellant argues, another associate of Maktabi then intervened and arranged the transaction in such a way as to purchase money orders for less than $10,000. Maktabi argues that had he known of the reporting requirement or had he been attempting to buy money orders in such a way as to avoid the reporting requirement, he would not have told his associate to buy a money order for $10,000. Thus, according to Maktabi, the "only possible conclusion" that can be drawn from this incident is that, at the time of the final purchase of money orders, he did not have the requisite specific knowledge of the reporting requirements coupled with guilty intent. We do not agree.

We have said that:

> Knowledge ... may be inferred or gathered from the outward manifestations, by the words or acts of the party charged with knowledge and from the facts and circumstances surrounding or attendant upon the act with which it is charged to be connected. It may be proved by all the facts and circumstances disclosed by the evidence taken in connection with the case.

*United States v. Sheiner*, 410 F.2d 337, 340 (2d Cir.), *cert. denied*, 396 U.S. 825, 90 S.Ct. 68, 24 L.Ed.2d 76 (1969) (quoting *Anderson v. United States*, 270 F.2d 124, 127 (6th Cir.1959)); *accord United States v. Sanzo*, 673 F.2d 64, 69 (2d Cir.), *cert. denied*, 459 U.S. 858, 103 S.Ct. 128, 74 L.Ed.2d 111 (1982). "[A] finding of knowledge that is largely inferential is not impermissible." *Sheiner*, 410 F.2d at 340.

■ Although the evidence does permit the inference that Maktabi did not know of the reporting requirements, we cannot conclude that there was no evidence from which *any* rational trier of fact could have found that Maktabi knew of the reporting requirements. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). That the evidence permits inferences that are consistent with innocence does not detract from its sufficiency. To be sufficient, "the evidence need not have excluded every possible hypothesis of innocence." *United States v. Soto*, 716 F.2d 989, 993 (2d Cir.1983). The jury could have inferred from the fact that Maktabi chose to carry out his currency exchanges in a series of small transactions over a number of days, rather than in a single transaction or several larger trans-

actions, that he knew of the reporting requirements and was attempting to avoid them. Contrary to Maktabi's assertion, more than one explanation exists for his associates' attempt to purchase a money order for $10,000 on December 17. Among other possibilities, the jury could have inferred that the associate misconstrued or misinterpreted Maktabi's instructions. Moreover, the jury could have inferred from the fact that another associate intervened to prevent the filing of a CTR that Maktabi was aware of the reporting requirements and that he had specifically instructed his associates to avoid triggering them.

We conclude that Maktabi was properly charged in Count Four of the indictment with conspiracy to either conceal material facts from the IRS or to defraud the United States, and that the evidence was sufficient to support an inference that he had specific knowledge and intent with respect to the reporting requirements. Maktabi's conviction on Count Four therefore is affirmed.

## VI. *Stop and Frisk of Elias Abdouch*

Elias Abdouch was convicted on one count of conspiring to distribute heroin, in violation of 21 U.S.C. § 846, and on one count of conspiring to import heroin into the United States, in violation of 21 U.S.C. § 963. The government's evidence against Abdouch consisted of (1) a number of taped conversations between Abdouch and Maysoun Annabi, Sami Annabi, and Angeel Abdouch, (2) physical evidence and documents seized from him or his apartment at the time of his arrest on December 18, 1984, including two personal telephone books, a social security card, a marriage certificate, $2,400 in cash, and a passport, and (3) testimonial evidence of surveillance of Elias Abdouch in November, 1984. It was the government's theory at trial that Elias Abdouch, together with his former wife, Angeel Abdouch, and his son, Antwan Abdouch, served as couriers bringing in drugs from the Middle East. On appeal, Elias Abdouch challenges the district court's decision to admit the testimony of a DEA agent about an airport stop and frisk.

The evidence surrounding the challenged stop and frisk can be briefly summarized. At a hearing conducted on Abdouch's motion to suppress, it was established that on November 16, 1984, New York State police investigators, who were surveilling Elias Abdouch in connection with his alleged drug importing activities, observed him traveling with Angeel Abdouch from Yonkers toward Newark Airport. At Newark Airport, the state authorities stopped Elias Abdouch and detained him. DEA agent Richard Musso, who arrived on the scene five to ten minutes later, observed Abdouch being detained by the state authorities and became concerned that this unplanned detention might compromise and jeopardize the ongoing drug investigation. Musso testified that in an attempt to prevent a premature arrest of Abdouch and others which would have aborted further investigations, he approached Abdouch and asked him whether he was a Palestinian terrorist. Musso, who identified himself as a police officer, examined Abdouch's passport and his small handbag to ensure that no weapon was inside. Next, Musso inquired about Abdouch's luggage and Abdouch responded by pointing to an area about fifty feet away from where they were standing. The two then walked to the area where the luggage had been left, whereupon Musso conducted a patdown to search for weapons. Musso felt two bulges in Abdouch's jacket, and upon Abdouch's opening his jacket, Musso observed a stack of money, about one-half inch thick, in each inside pocket. Musso noted that the stacks of bills consisted primarily of fifty and hundred-dollar denominations. After the patdown, Musso continued his search of Abdouch's luggage, and after accompanying Abdouch to his passenger terminal, Abdouch was released and not detained further. The district court suppressed any testimony about the denominations of the bills observed by Musso. However, the district court permitted Agent Musso to testify on direct-examination at trial about his attempt to intervene in the unplanned detention of Abdouch and that upon patting down Abdouch for weap-

ons, he had discovered two stacks of bills in his jacket pockets.

Abdouch does not contest that at the time he was initially stopped by the state police investigator there existed reasonable suspicion that he was engaged in criminal activity relating to the importation and distribution of narcotics, such that a limited investigative stop would have been proper under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Rather, Abdouch claims that the continuation of the *Terry* stop by DEA agent Musso was unlawful because it was performed based on a pretext unrelated to narcotics. According to Abdouch, since Agent Musso continued the *Terry* stop on pretextual grounds, the stop was not justified, and any evidence derived therefrom must be suppressed.

In *Terry*, the Supreme Court stated that the validity of a brief investigatory stop was to be "judged against *an objective standard:* would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" 392 U.S. at 21–22, 88 S.Ct. at 1880 (emphasis added). Similarly, in *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981), the Court stated that a *Terry* investigative stop will be upheld where "the detaining officers [had] a particularized *and objective basis* for suspecting the particular person stopped of criminal activity" (emphasis added). Our court has held that "the proper standard for judging the constitutionality of a search is a *totally objective one.*" *United States v. Smith*, 643 F.2d 942, 944 (2d Cir.) (emphasis added), *cert. denied*, 454 U.S. 875, 102 S.Ct. 350, 70 L.Ed.2d 182 (1981).

Applying an objective standard, courts have frequently discounted the subjective intent or motivations of searching officers. *Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978) ("the fact that the officer does not have the state of mind which as hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action as long as the circumstanc-

es, viewed objectively, justify that action"); *Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985) (whether violation of fourth amendment has occurred turns on objective assessment of officer's actions, not on officer's actual state of mind at the time the challenged action was taken). In *Smith*, we upheld a domestic airport security search for which there existed an independent and adequate objective basis and disregarded the district court's subjective inquiry into the motives of the airline security personnel who performed the search. 643 F.2d at 944–45.

■ An objective standard should similarly be applied in analyzing this case. It is not disputed that the initial stop of Abdouch by a state investigator was justified in light of the objective existence of reasonable suspicion that he was involved in drug-related activities. Agent Musso continued the detention, however, by offering a pretext that Abdouch was involved in terrorism. In our view, a valid basis for a detention and search which exists in the first place, is not rendered invalid by the fact that police resort to a pretext for one purpose or another to continue that detention and search. While in most instances, it would seem appropriate for the police to be forthright and honest in expressing the basis upon which they are relying in conducting an investigatory stop and search, the justification given by the police is not essential in determining whether the apprehension is constitutionally justified. The pivotal factor in determining whether a search violates the fourth amendment is whether there exists at the outset a valid basis for that search. In this instance, it is not disputed that such a valid basis existed. Therefore, we hold that subsequent intervention by another law enforcement officer, relying upon a pretextual basis to carry out a search, does not alter the validity of the initial detention or the sequence of events following in its wake.

Support for our holding can be found in a similar case decided recently by the Third Circuit. In *United States v. Hawkins*, 811 F.2d 210 (3d Cir.1987), Philadelphia police officers were conducting surveillance of a

house for possible narcotics activity. The officers then observed some people leave the house and enter a car which they followed. The officers stopped the car, frisked the passengers and found narcotics on the defendant. The court held, that although there was no evidence to support the officers' testimony that they stopped the car in order to conduct an investigation of alleged traffic violations, nevertheless, because there was a reasonable objective basis to suspect the defendant of criminal activity, the stop was justified. The court stated "the fact that a pretext was given does not render invalid an otherwise constitutional search." *Id.* at 215 (footnote omitted).

Abdouch's claim that because Agent Musso's patdown was not conducted immediately it could not have been conducted based on a concern for the agent's safety is without merit. Agent Musso testified that the patdown was designed to protect him from the possibility of weapons, but that he did not conduct it sooner because he was initially concerned with the fact that Abdouch had been detained. It is well within reason for an agent to assume that a suspected narcotics courier whose job it is to transport large sums of money and valuable narcotics might carry a weapon. We have stated in the past that "firearms are as much 'tools of the [narcotics] trade' as are most commonly recognized articles of narcotics paraphernalia." *United States v. Oates,* 560 F.2d 45, 62 (2d Cir.1977) (quoting *United States v. Wiener,* 534 F.2d 15, 18 (2d Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976)). That Agent Musso may have had some concern for the integrity of his investigation does not mean that he could not have had at the same time a legitimate concern for his safety. Certainly, the fourth amendment does not prescribe a timetable for exactly when during the course of a *Terry* stop an officer must perform a patdown to protect against the possibility of possession of weapons.

■■■ Abdouch also argues that a search or frisk of an individual must be accompanied by an intent to arrest whether or not probable cause exists for making the arrest at the outset. He claims that to permit stops and searches which are not accompanied by an intent to arrest, such as the one conducted in the instant case, violates public policy in that it gives law enforcement officials unlimited powers of harassment. However, a defendant has no right to be arrested at any particular time, even if there is probable cause to do so. *Hoffa v. United States,* 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374 (1966); *United States v. Waltzer,* 682 F.2d 370, 373 (2d Cir.1982), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983). There is no reason to exempt a suspect from an otherwise legitimate investigative stop merely because the officer making the stop did not intend to arrest. Further, while a *Terry* stop must take place "in appropriate circumstances and in an appropriate manner," *Terry,* 392 U.S. at 22, 88 S.Ct. at 1880, this case does not present an instance of harassment, repetitive stops, or untrammeled intrusions which very well may not meet that standard.

## VII. *Identification of Nedam Annabi*

Nedam Annabi was convicted on one count of conspiracy to distribute heroin, in violation of 21 U.S.C. §§ 841 and 846, and on one count of possession of heroin, in violation of 21 U.S.C. §§ 812 and 841 and 18 U.S.C. § 2. On appeal, Annabi challenges the in-court identification of him by the witness Jorge Luis Audinot as being the product of impermissibly suggestive pretrial identification procedures and as being inherently unreliable.

The district court conducted a *Wade* hearing with respect to Annabi's motion to suppress Audinot's identification. At the hearing, Audinot testified that he had met Nedam Annabi, whom he knew as "Joe," during the course of two drug transactions in August 1984. Audinot stated that on the first occasion he was together with Joe for twenty minutes in an apartment that was illuminated with electric lights, and that he conversed with him at a close distance of two or three feet. Audinot specifically recalled that at this meeting, Joe said something in Spanish so well that "I *looked*

at him, [and] I said, '[y]ou said that pretty well'" (emphasis added). On the second occasion, Audinot was together with Joe for about fifteen minutes in the kitchen of the same apartment, where they talked to each other and to others who were also present for the subject drug deal. Audinot characterized the conversations at the second meeting as "a little bit more friendly" than at the first meeting and stated that he shook everybody's hands. Audinot later learned from Sami Annabi that "Joe" was Nedam Annabi, Sami's brother.

Audinot also testified at the hearing that he saw Nedam Annabi on two or three other occasions in late 1984 or early 1985 at the Metropolitan Correctional Center ("MCC"). Audinot stated that at that time he and Sami Annabi were incarcerated on the same floor of the MCC and that during his incarceration, he observed Nedam Annabi, together with Maysoun Annabi, in the visiting room of the MCC waiting to visit Sami Annabi. Audinot did not speak with Nedam Annabi on those occasions.

Audinot testified further about his pretrial identification of Nedam Annabi. He testified that in March 1985, DEA agent Musso showed him a group of color photographs, approximately ten at a time, and asked him if he recognized any of the people pictured. He testified that Agent Musso did not ask any specific questions regarding the photographs or single out any photographs in any fashion. At that session, Audinot identified the photograph of Nedam Annabi as the person whom he knew as Joe, as well as others such as Sami and Maysoun Annabi. Later, on October 17, 1985, Audinot testified, he was again shown a group of pictures, similar to the ones he had seen earlier, and he recognized a number of appellants, including Nedam Annabi.

Agent Musso's account of the identification sessions held with Audinot differed from Audinot's. Musso testified that at the initial interview in March he had first shown Audinot a black and white mug shot of Nedam Annabi and asked him "[d]o you recognize this person?" Audinot responded affirmatively and identified the person

as Joe. After this identification, Musso testified, he showed Audinot a large number of color photographs, whereupon Audinot identified a number of people including Nedam Annabi.

The district court made no specific finding that it believed Agent Musso's account of the first identification session rather than Audinot's account. However, it seems implied from the district court's discussion of whether the showing of an individual photograph is a suggestive identification procedure that it credited Musso's account. Thus, assuming the identification occurred as Agent Musso described, with Audinot first being shown a single black and white mug shot rather than a full array of photographs, we nevertheless find no fatal defect in Audinot's courtroom identification of Nedam Annabi, because, in our view, the identification bore sufficient indicia of reliability and was not prejudicially affected by the pretrial procedures employed.

Identification testimony will be suppressed only if it is determined, first, that the pretrial identification was unduly suggestive, and, second, that the suggestiveness rendered the subsequent identification at trial so unreliable as to require its exclusion from evidence. *United States v. Leonardi*, 623 F.2d 746, 754 (2d Cir.), *cert. denied*, 447 U.S. 928, 100 S.Ct. 3027, 65 L.Ed.2d 1123 (1980). The determination of reliability is made based upon "the totality of the circumstances, including the suggestive procedure used by the police." *Styers v. Smith*, 659 F.2d 293, 299 (2d Cir.1981). When applying the relevant factors set forth in *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), for assessing the reliability of identification evidence, it becomes apparent that Audinot's identification of Nedam Annabi was reliable independent of the pretrial procedures. First, Audinot had a sufficient opportunity to view Nedam Annabi. He was involved in drug transactions with Nedam Annabi on two separate occasions, each lasting at least fifteen minutes, and both involving conversations between the two men. The second deal was transacted

in what Audinot describes as a "friendly" or "loose" atmosphere. Second, Audinot can be said to have paid a significant degree of attention to Nedam Annabi. At the first meeting, Annabi's use of a Spanish word caused Audinot to take particular note and prompted him to look specifically at him and remark "[y]ou said that very well." Third, Audinot's identification of Nedam Annabi when initially shown not only the mug shot but also the series of photographs was certain. His identification at trial was equally certain. Finally, although approximately six months elapsed between Audinot's August 1984 meetings with Nedam Annabi and the first identification session in March 1985, a factor that tends to lessen the reliability of the identification, nevertheless, in our view, this factor is outweighed by the other factors that support the reliability of the identification. *See Neil v. Biggers,* 409 U.S. 188, 201, 93 S.Ct. 375, 383, 34 L.Ed.2d 401 (1972). Moreover, other circumstantial evidence in the case points to the reliability of Audinot's identification. For instance, the evidence at trial established that Nedam Annabi's nickname was "Joe," the name by which Audinot knew Nedam Annabi. Viewing the totality of the circumstances, we cannot say that there was such a substantial likelihood of misidentification that Audinot's in-court identification should have been suppressed.

Annabi claims that a stipulation introduced later in the trial presents compelling proof of the strong likelihood of misidentification in this case. As noted, Audinot testified at the *Wade* hearing that he observed Nedam Annabi on two or three occasions visiting his brother Sami at the MCC. A stipulation was introduced to the effect that the MCC records did not show any visits made by Nedam Annabi. However, the introduction of this stipulation does not dictate suppression. The stipulation was used on cross-examination to impeach Audinot's testimony. The decision whether to credit Audinot's testimony that he observed Nedam Annabi visiting his brother at the MCC was therefore one properly left in the hands of the jury. The MCC records do not cast sufficient doubt on the reliability of Audinot's identification that it should have been suppressed.

## VIII. *Double Jeopardy and Violation of Cooperation Agreement*

As noted, prior to his indictment herein, Sami Annabi had been indicted in the Eastern District of New York in three counts which charged conspiracy to import, importation, and possession of heroin. Pursuant to a plea agreement with the government in 1983, Annabi pleaded guilty to the importation count, and the government agreed to dismiss the conspiracy and possession counts. The indictment in the instant case, filed in the Southern District of New York in 1985, charged Sami Annabi, *inter alia,* in Counts One and Three with conspiracy to distribute heroin, in violation of 21 U.S.C. § 846, and engaging in a continuing criminal enterprise beginning before his 1982 arrest until the return of the instant indictment in 1985, in violation of 21 U.S.C. § 848.

■ Sami Annabi now alleges that his convictions on Counts One and Three herein violate the Double Jeopardy Clause of the United States Constitution. Specifically, Annabi claims that the Double Jeopardy Clause is violated when evidence giving rise to a prior conviction is again presented to secure a second conviction under an umbrella statute which involves a continuing course of conduct such as a conspiracy or continuing criminal enterprise statute or the use of that evidence was so prejudicial as to deny appellant a fair trial. This argument is without merit. It is well settled that "[t]o support a claim of double jeopardy, it must appear that the offenses charged were in fact and in law the same." *United States v. Armedo-Sarmiento,* 545 F.2d 785, 792 (2d Cir.1976), *cert. denied,* 430 U.S. 917, 97 S.Ct. 1331, 51 L.Ed.2d 595 (1977). An indictment, such as the instant one, which charges a wide-ranging conspiracy involving numerous illegal drug transactions and a continuing criminal enterprise differs substantially from one which charges only a single isolated transaction. *Id.* (conspiracy); *United States v. Mourad,* 729 F.2d 195, 203 (2d Cir.1984) (continuing

criminal enterprise), *cert. denied,* 469 U.S. 855, 105 S.Ct. 180, 83 L.Ed.2d 114 (1984) & 472 U.S. 1007, 105 S.Ct. 2700, 86 L.Ed.2d 717 (1985). The instant charges cover conduct extending more than two years beyond the date of Annabi's prior conviction and require evidence different from and additional to evidence that would have been used to support Annabi's Eastern District substantive importation prosecution had he not pleaded guilty. That Annabi's prior Eastern District conviction arose from his importation of heroin in 1982 which act was also alleged as a minor part of the present conspiracy and continuing criminal enterprise is not enough to establish a double jeopardy claim. *United States v. Ricco,* 549 F.2d 264, 273 (2d Cir.), *cert. denied,* 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 389 (1977); *see also United States v. Hinton,* 543 F.2d 1002, 1015 (2d Cir. 1976), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976), 429 U.S. 1051, 97 S.Ct. 764, 50 L.Ed.2d 767 (1977), 429 U.S. 1066, 97 S.Ct. 796, 50 L.Ed.2d 783 (1977), & 430 U.S. 982, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977).

More troublesome is Annabi's claim that his rights under an unwritten cooperation agreement were infringed by the government's use against him of disclosures made by him to government agents and in court on the government's behalf. The cooperation agreement called for Annabi to cease his heroin dealings and to provide the government with full and complete information and testimony in exchange for the government's promise that anything Annabi told the government would not be used against him. Annabi claims that this cooperation agreement granted him informal immunity. *See United States v. Librach,* 536 F.2d 1228, 1230 (8th Cir.), *cert. denied,* 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976). Therefore, he argues, citing *United States v. Moss,* 562 F.2d 155, 165 (2d Cir.1977), *cert. denied,* 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978) (whether immunized testimony is perjurious and therefore can be used against a witness requires some preliminary finding of fact or clear documentary evidence or later objective proof), that if

the government in fact used Annabi's testimony against him without prior notice and without previously establishing that he had breached his part of the agreement, the government would have violated its part of the agreement. The government cannot rely on the jury's subsequent guilty verdict to prove that Annabi breached his part of the agreement and at the same time use disclosures made pursuant to that agreement to obtain the conviction. However, Annabi does not point to, and we are unaware of, any disclosures made by Annabi during his period of purported cooperation that actually were placed before the jury. Annabi's only specific allegations are that the government used his statements and in-court testimony to support an application for an order to place a wiretap on his phone before it was established that he had breached the cooperation agreement and that evidence obtained from this wiretap was used against him. As discussed above in section III, apart from Annabi's statements, there was enough independent evidence to establish probable cause for the wiretap, thereby rendering Annabi's disclosures cumulative. Under these circumstances, we cannot say that any of Annabi's statements, or evidence derived from those statements were admitted against him in violation of his cooperation agreement.

## IX. *Ineffective Assistance of Counsel*

Sami Annabi charges that his trial counsel provided him with ineffective representation. In assessing a claim of ineffective assistance of counsel, we are guided by the two-pronged standard set forth by the Supreme Court in *Strickland v. Washington* that to prevail on such a claim a defendant must show both that his attorney's conduct fell below an objective standard of reasonableness under prevailing professional norms, and prejudice such that but for counsel's unprofessional conduct the result would have been different. 466 U.S. 668, 687–88, 693–94, 104 S.Ct. 2052, 2064, 2067–68, 80 L.Ed.2d 674 (1984); *accord Darden v. Wainwright,* 477 U.S. 187, 106 S.Ct. 2464, 2473–74, 91 L.Ed.2d 144

(1986); *United States v. Cruz,* 785 F.2d 399, 405 (2d Cir.1986). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland,* 466 U.S. at 700, 104 S.Ct. at 2071.

In his brief, Sami Annabi enumerates what he perceives as a number of errors and failings by his trial counsel. For instance, he argues, *inter alia,* that his attorney's waiver of an opening statement, brief summation, failure to raise objections, failure to call witnesses for the defense, failure to cross-examine prosecution witnesses, failure to file certain motions, and failure to adequately investigate, prepare, and vigorously pursue a defense constituted conduct that fell below an objective standard of reasonableness, and except for that conduct there was a reasonable probability that he would not have been convicted. Most of these claims do not survive the first prong of the *Strickland* test which looks to whether counsel's performance was deficient under the totality of the circumstances, *id.* at 688, 104 S.Ct. at 2064. Others, if we assume a failure to meet professional norms and we do not make such a finding, do not meet the second prong of the *Strickland* test which calls for demonstrating prejudice. We consider the claims seriatim.

■ Annabi first points to counsel's waiver of an opening statement and brevity of summation as demonstrative of unprofessional conduct. However, the decision whether to make an opening statement and when to make it is ordinarily a matter of trial tactics and strategy which will not constitute the incompetence basis for a claim of ineffective assistance of counsel. *United States v. Rodriguez-Ramirez,* 777 F.2d 454, 458 (9th Cir.1985); *Murray v. Maggio,* 736 F.2d 279, 283 (5th Cir.1984) (per curiam). Counsel's choice of strategy was certainly reasonable under the circumstances. By waiving opening argument the defense did not commit itself to a particular position and was thus free to develop any defense that might materialize as the prosecution presented its case. *Jones v. Smith,* 772 F.2d 668, 674 (11th Cir.1985),

*cert. denied,* 474 U.S. 1073, 106 S.Ct. 838, 88 L.Ed.2d 809 (1986). Moreover, counsel's summation was not unduly brief. In his summation, which occupied thirty-one pages of trial transcript, Annabi's counsel confronted the evidence and attempted to attack the case against his client.

■ Other examples of errors cited by Annabi also relate to decisions which fall squarely within the ambit of trial strategy, and, if reasonably made, will not constitute a basis for an ineffective assistance claim. The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial. Annabi does not identify any witnesses that his counsel should have called who would have been helpful. Defense counsel's conduct in this regard appears to fall within the wide range of reasonable professional representation. *United States v. Murray,* 751 F.2d 1528, 1535 (9th Cir.), *cert. denied,* 474 U.S. 979, 106 S.Ct. 381, 88 L.Ed.2d 335 (1985). Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are similarly strategic in nature. In this instance, Annabi's counsel was close to last in the order of questioning by numerous defense counsel. Counsel might very well have felt that there was little need for additional probing by the time it was his turn to cross-examine, or even that cross-examination at that point might have been counterproductive. *See United States v. Bari,* 750 F.2d 1169, 1182 (2d Cir.1984), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985).

Annabi also claims that his lawyers failed to file motions important to his defense during pretrial, trial, and post-conviction periods. However, Annabi does not point to any motions that should have been filed but were not. Annabi claims only that the motion for severance which was filed was not "adequate" or "zealously pursued," and that a motion to suppress wiretap evidence failed to raise the argument that government investigators did not properly minimize non-pertinent conversations in accordance with 18 U.S.C. § 2518(5).

Moreover, for purposes of effective assistance, not every possible motion need be filed, but rather, only those having a solid foundation. *United States v. Afflerbach,* 754 F.2d 866, 870 (10th Cir.), *cert. denied,* 472 U.S. 1029, 105 S.Ct. 3506, 87 L.Ed.2d 636 (1985). Counsel certainly is not required to engage in the filing of futile or frivolous motions. *Maggio,* 736 F.2d at 283. The record demonstrates that Annabi's counsel did pursue legal issues that might have had an effect on the prosecution. For example, before trial, counsel raised double jeopardy and plea agreement claims which were the subject of an interlocutory appeal to this Court, *see United States v. Annabi,* 771 F.2d 670 (2d Cir. 1985) (per curiam), and, during trial, counsel vigorously sought to preclude certain tape recordings, which the government sought to introduce, as violative of Annabi's cooperation agreement with the government, see section III, *supra.*

While we are limited by the record in our evaluation of whether Annabi's trial counsel failed to adequately investigate and prepare a defense, even assuming *arguendo* that counsel's performance was professionally deficient, in our view, Annabi cannot meet the second prong of the *Strickland* test which calls for demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. at 2068. The evidence against Annabi was overwhelming. In fact, at one point, the district court observed, outside the presence of the jury, that there was "more than sufficient evidence to convict him twelve times over." Annabi, who testified in his own defense, presented a number of defenses in which he tried to explain his conduct as relating to gambling, a clandestine gold trade in which he was involved, the sale of land that his family owned in Jordan, a carpet business that he was involved in, and his own admitted cocaine usage. That the jury did not believe his explanations does not warrant a claim of ineffective assistance of counsel. Other defendants who joined in Annabi's proffered defenses also were convicted, indicating that the jury simply did

not believe Annabi's defenses and that Annabi was not prejudiced by any errors in representation. Moreover, Annabi was acquitted by the jury on two counts which indicates that the jury carefully concentrated on the individual counts charged against Annabi and convicted him based on the evidence in the case. Under all these circumstances, we cannot conclude that Sami Annabi was prejudiced by any errors committed by his trial counsel or that counsel's conduct was unprofessional.

### X. *Variance from the Indictment*

Two appellants, Murad Nersesian and Hassan Maktabi, raise claims of prejudicial variance from the indictment. Their claims are without merit.

### A. Nersesian

Count Nine of the indictment charged Basil Cannata and Murad Nersesian with distribution and possession with intent to distribute approximately 1300 grams of heroin "on or about June 1984," in violation of 21 U.S.C. §§ 812 and 841. Toward the beginning of trial, Basil Cannata testified for the government that he delivered 1300 grams to Nersesian in Arthursburg, New York. Cannata also testified that he thought the delivery took place in the first week of July, when he was preparing to go to Florida with his wife. Later, Cannata was recalled as a defense witness and testified that he had been going to Florida regularly for twenty years but did not recall exactly when in the summer of 1984 he had gone there or exactly when the delivery of heroin had occurred but that the transaction had taken place at the time he was preparing to leave for Florida. The defense, in an attempt to impeach Cannata's testimony, introduced by stipulation records from the hotel where Cannata had stayed while in Florida which showed that the dates of his visit were from August 18 until September 3, 1984. The hotel had no record that Cannata and his wife stayed there in July 1984. In summation, the government argued that given the uncertainty with which Cannata remembered dates, and the hotel records, the actual date

of the heroin delivery to Nersesian may have been in July or perhaps even early August.

Nersesian claims on this appeal that the government's argument in summation came as a complete surprise and amounted to a prejudicial variance from the June date charged in the indictment. First, we note that the indictment used the words "on or about June 1984." Where "on or about" language is used, the government is not required to prove the exact date, if a date reasonably near is established. *United States v. Grapp*, 653 F.2d 189, 195 (5th Cir.1981). This is especially true where, as here, the exact time when an offense was committed is not an essential element of the offense charged. *See United States v. Weiss*, 752 F.2d 777, 787 (2d Cir.), *cert. denied*, 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985). In our view, the government's argument that the date of the actual transaction was possibly July or early August was not an improper material variance from the "on or about June 1984" date charged in the indictment.

Moreover, any variance between the indictment and the proof does not mandate reversal absent a showing that the variance caused substantial prejudice to the appellant. *Id.* at 790. Appellant's claim of surprise is belied by what actually transpired at trial. Cannata's testimony for the government linked the Arthursburg drug transaction to his Florida visit which he thought occurred in July. Seeking to impeach Cannata's testimony, Nersesian's counsel examined Cannata at length about the subject transaction and introduced hotel records to show that Cannata's visit had not really occurred until August. The defense properly argued that the hotel records suggested that Cannata was not a credible witness. On the other hand, the government properly argued that the records fundamentally corroborated Cannata's testimony. Nersesian cannot now claim surprise after his counsel demonstrated his awareness of the alleged Arthursburg drug transaction and presented a defense to it.

**B. Maktabi**

Counts One and Two of the indictment charged Hassan Maktabi with conspiracy to distribute heroin, in violation of 21 U.S.C. § 846, and conspiracy to import heroin, in violation of 21 U.S.C. § 963. Count Four of the indictment charged Maktabi with conspiracy to defraud the United States and conspiracy to conceal material facts from the IRS by causing banks to fail to file Currency Transaction Reports ("CTRs") in violation of 18 U.S.C. § 371. The government's theory from pretrial motions through summation at trial was that Maktabi acted as a supplier of heroin for Sami Annabi's operation. Maktabi argues that the government prejudicially varied the indictment when in summation it argued to the jury that Maktabi had narcotics customers other than Sami Annabi. Specifically, Maktabi objects to the prosecutor's statement that Maktabi had come to the United States because "he was settling an account, he was collecting money from one of his customers, and he was calling on another of his customers, Sami Annabi."

We think that the prosecutor's inference and suggestion to the jury were permissible based on the evidence in the case. In one intercepted telephone conversation, one Abu Louz, alleged to be an associate of Sirop Siropian, another of Annabi's alleged suppliers, called Sami Annabi inquiring about the whereabouts of Maktabi. Abu Louz told Annabi: "He's [Maktabi] coming because he has an account (a matter) with some people.... An old account (matter)—He might stop to see you...." Because there was other evidence to show Maktabi's role as a heroin supplier, the jury could reasonably have inferred that Maktabi was in the narcotics business and that he had more than one customer. The reference to the "account (matter)" that Maktabi came to settle could reasonably be understood to mean that Maktabi had come to collect money from one of his customers. Moreover, the prosecutor's statement did not constitute a prejudicial variance of the indictment. Evidence that Maktabi was collecting money from his customers is relevant to show his

role as a narcotics supplier in general, which could tend to prove that he also supplied Annabi. Furthermore, evidence that the source of the large amount of cash which he converted to money orders was narcotics-related was directly relevant to demonstrating his motive in keeping banks from filing CTRs. Accordingly, the government did not impermissibly or prejudicially change its theory of the case from that charged in the indictment.

## XI. *Sufficiency of the Evidence*

Three appellants, Machaalani, Maktabi, and Sami Annabi, claim that the evidence was insufficient to sustain their convictions on certain counts. We find the claims of appellants Machaalani and Maktabi to be without merit. Sami Annabi's claim as to Counts Twenty-Two and Twenty-Three does have merit. We briefly set forth the reasons for our conclusions.

The standards by which we review claims challenging the sufficiency of the evidence are well established. A defendant challenging the sufficiency of the evidence bears a heavy burden. *United States v. Losada*, 674 F.2d 167, 173 (2d Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). A jury's verdict will be sustained if there is substantial evidence, taking the view most favorable to the government, to support it. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Therefore, a reviewing court "must credit every inference that could have been drawn in the government's favor, and ... affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt." *United States v. Giraldo*, 822 F.2d 205, 213 (2d Cir.1987) (citations omitted). If "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the conviction must be upheld. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). These principles apply whether the evidence under review is direct or circum-

stantial. *See Glasser*, 315 U.S. at 80, 62 S.Ct. at 469.

### A. Machaalani

Appellant Machaalani was convicted on one count of conspiracy to distribute heroin, in violation of 21 U.S.C. §§ 841 and 846 (Count One), and on one count of conspiracy to import heroin, in violation of 21 U.S.C. §§ 952, 955, 960 and 963 (Count Two). The government's evidence against Machaalani included the testimony of Basil Cannata, an accomplice, who testified that he and Nedam Annabi picked up 1300 grams of heroin from Machaalani in Boston. Other evidence of Machaalani's involvement in the conspiracy included intercepted telephone conversations involving appellant and Sami Annabi, interpreted by Agent Nolan to be "drug-related," testimony by Jorge Audinot that Sami Annabi referred to Machaalani as one of his couriers, and surveillance of a meeting between appellant and Sami Annabi. In conspiracy cases, " 'once a conspiracy is shown, only slight evidence is needed to link another defendant with it. . . .' " *United States v. Wilkinson*, 754 F.2d 1427, 1436 (2d Cir.) (citation omitted), *cert. denied*, 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985). Therefore, we conclude that the government's evidence was sufficient to permit a rational juror to conclude beyond a reasonable doubt that Machaalani was a member of the charged conspiracy.

### B. Maktabi

Hassan Maktabi, in addition to being convicted under § 371 on one count of conspiracy to defraud the United States or conspiracy to conceal material facts (Count Four), see section V, *supra*, was convicted on one count of conspiracy to distribute heroin, in violation of 21 U.S.C. §§ 841 and 846 (Count One), and on one count of conspiracy to import heroin, in violation of 21 U.S.C. § 963 (Count Two). Maktabi claims that there was insufficient independently admissible evidence of his membership in the conspiracy to warrant the admission of co-conspirator hearsay, Fed.R.Evid. 801(d)(2)(E), under *United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir.1969), *cert.*

*denied,* 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970).[4]

■ Hearsay statements made by persons alleged to be co-conspirators are admissible if the trial court makes a preliminary finding under Fed.R.Evid. 104(a) that the defendant was a member of the conspiracy and that the statements were made in furtherance of the conspiracy. *United States v. DeJesus,* 806 F.2d 31, 34 (2d Cir. 1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1299, 94 L.Ed.2d 155 (1987). "Proof of [a defendant's] membership [in a conspiracy] under Rule 104(a) need only be by a preponderance of the evidence." *Id.*

The government presents us with a number of items of independently admissible evidence to link Maktabi to the conspiracy charged, some of which evidence is admittedly weaker than other evidence. We begin with what we consider to be the weaker evidence of Maktabi's membership in the conspiracy.

■ The government claims that Maktabi's role as a supplier is demonstrated by Sami Annabi's statement in an intercepted phone conversation to Theresa Audinot just before going to meet Maktabi that "I'm going to see other people with my kind of *brochure*" (emphasis added). The government acknowledges that this is a hearsay statement made by a co-conspirator but argues that it is independently admissible in any case. Hearsay statements reflecting a declarant's intentions or future plans are admissible against the declarant to prove subsequent acts under Fed.R.Evid. 803(3). *DeJesus,* 806 F.2d at 35; *United States v. Cicale,* 691 F.2d 95, 103–04 (2d Cir.1982), *cert. denied,* 460 U.S. 1082, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983). More importantly, declarations of intention or future plans are admissible against a nondeclarant when they are linked with independent evidence that corroborates the declaration. *United States v. Sperling,* 726

F.2d 69, 74 (2d Cir.), *cert. denied,* 467 U.S. 1243, 104 S.Ct. 3516, 82 L.Ed.2d 824 (1984). There appears to be independent evidence which would corroborate Sami Annabi's statement. For instance, government agents who surveilled Annabi testified that after this phone call, Annabi picked up Maktabi and drove to a restaurant where they met with Jorge Audinot and his sister. A district judge also could infer, in the overall context of the evidence presented, that Annabi's reference to "a brochure" in his statement was a code word for narcotics. Accordingly, Annabi's statement would appear to be independently admissible against Maktabi and would tend to prove his membership in the conspiracy.

The government also claims that Maktabi's involvement in the conspiracy may be inferred from his possession of approximately $120,000 in cash with which he bought money orders. While possession of large amounts of cash, especially when some is in small denominations, is not proof per se of drug trafficking, it is certainly not unreasonable that it might justify a suspicion, in context, of such trafficking. *Cf. United States v. Young,* 745 F.2d 733, 762–63 (2d Cir.1984) (large amount of unexplained and unreported wealth highly probative of narcotics trafficking), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985).

■ We acknowledge that while these items of evidence are independently admissible against Maktabi, they only weakly link him to the conspiracy charged. However, we are more impressed with another piece of evidence offered by the government. That piece alone, and certainly in conjunction with the items mentioned above, is sufficient, in our view, to show Maktabi's membership in the conspiracy by a preponderance of the evidence. The government points to a phone call made by Maktabi from Syria on November 11, 1984 to Maysoun Annabi. In that call Maktabi

---

**4.** We note that under *Bourjaily v. United States,* —— U.S. ——, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), a district court, in making a preliminary determination under Rule 801(d)(2)(E), may also examine the hearsay statements sought to be admitted. However, because we agree with

the district court's conclusion that there existed sufficient independent evidence, we do not find it necessary to also examine the co-conspirator hearsay statements themselves for evidence of Maktabi's membership in the conspiracy.

can be heard demanding payment from Maysoun. The government argues that it may be inferred that the demand was for payment for heroin. Although such an inference is neutralized somewhat because the demand was made in relation to gold jewelry, more to the point is that portion of the call in which Maktabi asks Maysoun if any problems arose from "Um Tony." The district judge, who had heard the government's evidence, was free to consider who "Um Tony" was, and there was evidence from which a conclusion could be drawn that she was really Angeel Abdouch, one of the conspiracy's alleged couriers. Moreover, the call also contained a reference which the district judge could have interpreted as a code for narcotics. Maktabi is heard explaining, "[t]here's not a house that I have, but I sold it." Although Agent Nolan, the government's expert, could not interpret the call as drug-related, his testimony was not binding on the district court. The district judge was free to conclude, and in fact did conclude, that the call related to the charged conspiracy and was sufficient to show Maktabi's link to it for *Geaney* purposes. Even if we were to disagree with the district judge's preliminary interpretation for purposes of a *Geaney* ruling, which we emphasize we do not, as a reviewing court, we may not substitute our judgment for the district court's where the evidence reasonably lends itself to the conclusion that the district court reached.

Having concluded that there was sufficient independent evidence to establish Maktabi's membership in the conspiracy for the purpose of a *Geaney* determination, hearsay statements of co-conspirators were properly admissible under Fed.R.Evid. 801(d)(2)(E). Those statements included, *inter alia,* Sami Annabi's statements to Cannata about the relations among the conspiracy's three alleged suppliers, Maktabi, Siropian, and Abu Hamadah, and Annabi's statement to Audinot that Maktabi had delivered ten kilograms of heroin to Annabi and that Annabi needed to pay Maktabi. Those co-conspirator hearsay statements plus the other evidence which was independently admissible, provided a sufficient basis, in our view, for a rational jury to convict Maktabi beyond a reasonable doubt of conspiracy to distribute and conspiracy to import heroin.

## C. Sami Annabi

Sami Annabi asserts that the evidence was insufficient to sustain his convictions on two counts which charged him with using a telephone to facilitate the commission of a felony, in violation of 21 U.S.C. § 843(b). Count Twenty-Two of the indictment charged Sami Annabi and Murad Nersesian with participation in a phone conversation on or about November 30, 1984 in order to facilitate the conspiracy to distribute heroin as charged in Count One. Count Twenty-Three charged Sami Annabi and Chicky D'Agostino, wife of Basil Cannata, with such a violation on or about November 25, 1984. In the November 30 phone call, Nersesian calls Annabi from a phone booth and, expressing disappointment, says "[e]verything, ah bad." Annabi expresses surprise at Nersesian's disappointment. At the end of the conversation, the two arrange to meet later that day. In one November 25 phone call, Annabi speaks to Chicky D'Agostino and demands to know where her husband, Basil Cannata is. In another phone call on November 25, Annabi complains to D'Agostino that he does not need her husband anymore and that after today "that's it ... I'm ... giving him an opportunity; I mean, I'm trying to make him and he treats me like a[n] ... idiot."

■ To sustain Annabi's conviction the government must have proved beyond a reasonable doubt that Annabi knowingly and intentionally used the telephone on these occasions to cause or facilitate the conspiracy to distribute heroin as set forth in Count One of the indictment. The district court so charged the jury. We believe that the evidence was insufficient to support a conviction under § 843(b) based on the evidence of these phone calls on these dates. None of the calls contained any direct reference to the distribution of narcotics. The government argues that circumstantial evidence permits the inference that these calls were related to the charged

distribution conspiracy. We agree that circumstantial evidence may be used to prove that a phone call is narcotics-related and was made in furtherance of a conspiracy, but, in this case, there was a dearth of such evidence to suggest that the calls facilitated the narcotics distribution conspiracy charged. With regard to the November 30 phone call, in which a meeting was arranged, there is evidence that a meeting occurred, but none to indicate that the business of the charged conspiracy was discussed. With regard to the November 25 phone calls, in which Sami Annabi inquired as to Cannata's whereabouts and expressed frustration at his inability to locate him, the government argues that the jury could have inferred that the calls facilitated the distribution conspiracy by pressuring Cannata to improve his drug sales efforts. But there is no evidence to tie these conversations to heroin, that Cannata even knew of the calls, or that the calls in any way facilitated the alleged scheme for heroin distribution. There is no appearance of any codes in the calls, nor is there expert testimony which addresses the content of these calls as being drug-related. We are simply unable to conclude that a rational juror could have concluded beyond a reasonable doubt based on the evidence that these calls facilitated the distribution conspiracy as charged. Accordingly, Sami Annabi's convictions on Counts Twenty-Two and Twenty-Three are reversed.

## XII. *Government's Summation*

 Several appellants maintain that the prosecutor made improper and prejudicial remarks during summation and rebuttal summation. They claim that those remarks went far beyond the "broad latitude" allowed to both the prosecutor and defense counsel in the inferences they may reasonably suggest to the jury during closing argument. *United States v. Suarez*, 588 F.2d 352, 354 (2d Cir.1978). In assessing a claim of prosecutorial misconduct we draw guidance from the Supreme Court's statement in *United States v. Young*, 470 U.S. 1, 11–12, 105 S.Ct. 1038, 1044–45, 84 L.Ed.2d 1 (1985), that "[i]nappropriate prosecutorial comments, standing alone, [do] not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding. Instead ... the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error." We have recently stated that "we will not lightly overturn a conviction solely on the basis of a prosecutor's misstatement in summation." *United States v. Cruz*, 797 F.2d 90, 93 n. 1 (2d Cir.1986). Whether a prosecutor's improper statement during summation results in a denial of due process depends upon whether the improper statement causes substantial prejudice to the defendant. *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir.1981) (per curiam), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). Bearing these standards in mind, we turn to an examination of the specific instances of excess argued by appellants.

Appellants generally contend that the prosecutor impermissibly vouched for the credibility of its case in its rebuttal summation. Appellants cite numerous instances in which they claim that the prosecutor personally attested not only to the witnesses' credibility but also to the government's version of the facts. For example, commenting on one witness' credibility, the prosecutor said, "*I think* that clearly, from what has been said Mr. Cannata [a government witness] was correct" (emphasis added). Or, commenting on the evidence a few minutes later, the prosecutor said: "*I think* it is fair to say that Mr. Restaino did deal after this incident with Mr. Annabi" (emphasis added). Appellants have identified at least 65 instances in which remarks by the prosecutor were replete with the use of the personal pronoun "I" or with assertions that a witness was "correct" or "right." At other times the prosecutor introduced a sentence with phrases such as "*I think* it is clear," "*I am going to suggest* to you," or "*I believe* on the basis of what you've heard" (emphasis added). On other occasions, the prosecutor answered rhetorical questions such as "was [the witness] correct?" with phrases such as "the answer is yes," or simply, "yes."

It is well settled that it is improper for a prosecutor to interject personal beliefs into a summation. *Young*, 470 U.S. at 8–9. The American Bar Association Standards for Criminal Justice state: "[i]t is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." ABA Standards for Criminal Justice 3–5.8(b) (2d ed. 1980); *see also United States v. Clark*, 613 F.2d 391, 405 (2d Cir.1979), *cert. denied*, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980); *Suarez*, 588 F.2d at 354. While we recognize that "*[o]ccasional use* of ... rhetorical devices is simply fair argument," *Modica*, 663 F.2d at 1181 (emphasis added), we stress that it is a poor practice, one which this court has repeatedly admonished prosecutors to avoid, *see id.* at 1179, for prosecutors to frequently use rhetorical statements punctuated with excessive use of the personal pronoun "I". It is a perfectly acceptable practice for a prosecutor to use language in addressing the jury such as "you are free to conclude," "you may perceive that," "it is submitted that," or "a conclusion on your part may be drawn," to mention only a few examples of unobjectionable phraseology. It is obligatory for prosecutors to find careful ways of inviting jurors to consider drawing argued inferences and conclusions and yet to avoid giving the impression that they are conveying their personal views to the jurors. *See id.* at 1178–81.

However, in deciding whether to reverse a conviction because of the use of the offending personal pronoun or other rhetorical language used improperly or with undue frequency, we assess whether such use amounts to unacceptable vouching. In this instance, we find that the summation, viewed as a whole, is not affected fatally. This is not to say that we find the repeated use of expressions such as, "I think it is clear," "Does it make sense—I think it does," "I don't think we have to guess," or "I think it is important" to be acceptable. Rather, in this instance, we conclude that the summation viewed as a whole does not reflect prejudicial improper vouching. Appellants point to no objectionable references in the government's initial summation which fills 123 pages of transcript and sought to focus the jury's attention on the government's evidence. The objectionable language occurred in portions of the rebuttal summation which filled some 43 pages of transcript. The prosecutor's offending conduct was thus limited to a relatively small portion of an overall lengthy summation. Although objected to later, contemporaneous objections were not taken by defense counsel. Therefore, the prosecutor did not disregard rulings of the trial court. The judge did instruct the jury that the lawyers' statements were not evidence. We note that the jury acquitted two defendants entirely, and three in part. The district court observed that, in its opinion, the jurors, who deliberated for ten days, "considered the evidence very carefully." Under these circumstances, it can hardly be said that appellants suffered substantial prejudice so as to deny them a fair trial. *See id.* at 1181–82. In our view, it can fairly be said that appellants' convictions were the result of the jury's assessment of the evidence, not the result of improper argument by the prosecutor. *See United States v. Biasucci*, 786 F.2d 504, 514–15 (2d Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986).

Also challenged by appellant Hani Fraih is a portion of the government's summation. Fraih claims that the prosecutor in summation suggested that he was involved in the actual transportation of heroin from the Middle East to the United States, an accusation which Fraih argues is unsupported by any evidence admitted at trial. Specifically, Fraih objects to the following remarks by the prosecutor:

> What actually happened during [Fraih's trip to the Middle East], I suggest to you Hani Fraih went to Syria to meet somebody maybe at that church, maybe someplace else, to deliver something and to pick something up; and I suggest to you that he delivered the money and he picked up the heroin.
>
> . . . .

Why do I say he picked up the heroin? Why waste the trip?

Fraih's counsel's objection to these remarks was overruled by the district court.

Though the prosecutor suggested that Fraih actually was involved in the transportation of heroin, Fraih was not charged in the indictment with substantive counts of narcotics importation or possession. However, taken as circumstantial proof that Fraih was involved in the conspiracy to distribute and the conspiracy to import, the actual charges brought against Fraih, the prosecution's accusation has some support in the record. One witness, Basil Cannata, did testify that Fraih traveled to Syria, on his and Sami Annabi's behalf, with money sewn into his coat to pay for heroin. Yet, he did not testify that Fraih transported or possessed heroin. On cross-examination, Cannata stated, "I have no personal knowledge that Hani Fraih is involved in narcotics." Hani Fraih, who testified in his own defense, admitted that he traveled to the Middle East, but denied bringing back any contraband into the United States. In asking the jury "[w]hy do I say he picked up heroin?" and answering "[w]hy waste the trip," the question is presented as to whether the prosecutor invited the jury to draw an inference not supported by evidence in the record.

■ We do not believe that the prosecutor's remarks dictate reversal. As stated above, a reversal is warranted only where improper statements have caused substantial prejudice to the defendant. *Modica*, 663 F.2d at 1181. In *Modica*, we identified three factors for determining the existence of substantial prejudice: the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements. *Id.; accord United States v. Valentine*, 820 F.2d 565 (2d Cir.1987). Applying these factors, we conclude that the prosecutor's remarks did not result in substantial prejudice to Hani Fraih, such that he was deprived of a fair trial.

■ Our first inquiry is to determine the severity of the claimed misconduct.

We do not think that it was especially grievous. The prosecutor's statement does not appear to have been intentionally made, or to be the product of a premeditated plan to suggest to the jury inferences not fairly supported by the evidence; rather, the comment appears to have been one made in passing. Furthermore, the remark was a brief statement in a lengthy summation which occurred after a months-long trial. As such, the remark can fairly be characterized as " 'a minor aberration[ ] in a prolonged trial.' " *Modica*, 663 F.2d at 1181 (citation omitted). Moreover, the remark was not wholly unsupported by evidence in the record, such as Cannata's testimony that the purpose of Fraih's trip to the Middle East was heroin-related. That appellant was not charged with substantive counts of narcotics importation or possession does not preclude the jury from considering evidence of such substantive violations with respect to the conspiracy counts. *United States v. Taylor*, 562 F.2d 1345, 1353 n. 3 (2d Cir.), *cert. denied*, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 & 434 U.S. 853, 98 S.Ct. 170, 54 L.Ed.2d 124 (1977); *United States v. Chen*, 629 F.Supp. 263, 271 (S.D.N.Y.1986). Circumstantial evidence that may be insufficient to support a conviction on a substantive count may still be considered by a jury on a conspiracy count. *See United States v. Anderson*, 611 F.2d 504, 510 (4th Cir.1979). Under these circumstances, the prosecutor's remarks do not appear particularly egregious.

■ Our second inquiry relates to the curative measures taken by the trial court to deal with the remarks. By sustaining a defendant's objection, or perhaps ordering that the remarks be stricken from the record and issuing a cautionary instruction to the jury, a district court can minimize the prejudicial effect of a prosecutor's remarks. However, in view of the de minimis nature of the prosecutor's alleged errors, the absence of prompt curative instructions did not prejudice appellant.

Finally, we inquire as to the certainty of conviction absent the challenged remarks. "[I]f proof of guilt is strong, then the prej-

udicial effect of the comments tends to be deemed insubstantial; if proof of guilt is weak, then improper statements are more likely to result in reversal." *Modica,* 663 F.2d at 1181. Although the evidence against appellant was not overwhelming as in *Modica,* it was clearly strong. The government proved that Fraih stored approximately $50,000 in his apartment, rented a safe deposit box together with Maysoun Annabi and stored $138,000 in it, kept a scale in his apartment, and rode in a car with Sami Annabi when Annabi made deliveries of narcotics to Jorge Audinot, an alleged co-conspirator, on a number of occasions. Large amounts of cash and a scale can fairly be said to be tools of the narcotics trade from which a jury could infer participation in a narcotics conspiracy. The strongest evidence in support of the government's theory is Basil Cannata's testimony that Fraih traveled to Syria with money sewn into his coat to pay for drugs. Although Fraih denied that he took any money for delivery with him on his trip and provided various innocent explanations for the money and scale found in his apartment and the money in the safe deposit box, the jury reasonably could have inferred from Cannata's testimony, supported by the other evidence, that Fraih was a part of the narcotics conspiracy charged in the indictment.

In sum, two of the three factors mentioned in *Modica* for assessing whether a defendant was prejudiced by claimed improper remarks by a prosecutor point toward a conclusion that Hani Fraih was not substantially prejudiced in this instance. We believe that any failure by the trial court to take corrective action to cure the effects of the challenged remarks was more than offset by the fact that the claimed impropriety was not egregious and the fact that the case against appellant was strong. It appears to us that based on the evidence properly admitted, the jury would have found Fraih guilty even absent the prosecutor's comments. We conclude that appellant did not suffer substantial prejudice as a result of the prosecutor's remark, and, accordingly, Hani Fraih's convictions on Counts One and Two are affirmed.

## CONCLUSION

We have considered appellants' other arguments and find them to be without merit. To the extent that the arguments of each appellant have been asserted by other appellants, our rulings are the same.

The judgments of conviction appealed from are all affirmed except for appellant Sami Annabi's convictions on Counts Twenty-Two and Twenty-Three, which are reversed.

Judgments affirmed in part, reversed in part.

### APPENDIX

| Defendant | Indictment (Count) | Disposition | Sentence |
| --- | --- | --- | --- |
| Antwan Abdouch | Conspiracy to Distribute (1) | Guilty | 7 years on each count to run concurrently; |
| | Conspiracy to Import (2) | Guilty | $50 special assessment on each count |
| Elias Abdouch | Conspiracy to Distribute (1) | Guilty | 7 years on each count to run concurrently; |
| | Conspiracy to Import (2) | Guilty | $50 special assessment on each count |
| Maysoun Annabi | Conspiracy to Distribute (1) | Guilty | 5 years on each count to run concurrently; |
| | Conspiracy to Import (2) | Guilty | $50 special assessment on each count |

| Defendant | Indictment (Count) | Disposition | Sentence |
|---|---|---|---|
| Nedam Annabi | Conspiracy to Distribute (1) | Guilty | 10 years and 6 years special parole on count 10; |
| | Conspiracy to Import (2) | Dismissed | 5 years probation on count 1; |
| | Substantive Narcotics Distribution (10) | Guilty | $50 special assessment on each count |
| Hani Fraih | Conspiracy to Distribute (1) | Guilty | 4 years on count 1; |
| | Conspiracy to Import (2) | Guilty | 5 years probation on count 2; $50 special assessment on each count |
| Sami Annabi | Conspiracy to Distribute (1) | Guilty | 25 years on each of counts 1, 3, 7, 11–14; |
| | Continuing Criminal Enterprise (3) | Guilty | 8 years on each of counts 22 and 23; |
| | Substantive Narcotics Distribution (7, 11–14) | Guilty | 5 years on count 25; 6 years special parole on counts 7, 11–14; |
| | Use of telephone to facilitate a narcotics felony (20–21) | Not Guilty | Sentences and special parole term to run concurrently; |
| | Use of telephone to facilitate a narcotics felony (22–23) | Guilty | $20,000 on each of counts 1, 3, 7, 11–14, 22–23; |
| | Illegal receipt of a firearm (25) | Guilty | $5,000 on count 25; |
| | Carrying a firearm during crime of violence (26) | Dismissed | $50 special assessment on each count |
| Abdallah Georges Machaalani | Conspiracy to Distribute (1) | Guilty | 6 years on count 1; 5 years probation on count 2; |
| | Conspiracy to Import (2) | Guilty | $50 special assessment on each count |
| Hassan Abdul Kader Maktabi | Conspiracy to Distribute (1) | Guilty | 10 years on each of counts 1 and 2 to run concurrently; |

| Defendant | Indictment (Count) | Disposition | Sentence |
|---|---|---|---|
| | Conspiracy to Import (2) | Guilty | 5 years on count 4 to run concurrently with sentence imposed on counts 1 and 2; |
| | Conspiracy to Defraud the United States (4) | Guilty | |
| | Unlawful transport of monetary instruments (19) | Dismissed | $50 special assessment on each count |
| Dennis Meade | Conspiracy to Distribute (1) | Guilty | 5 years on each count to run concurrently; |
| | Conspiracy to Import (2) | Guilty | $50 special assessment on each count |
| | Substantive Narcotics Distribution (6) | Not Guilty | |
| Murad Nersesian | Conspiracy to Distribute (1) | Guilty | 15 years on each count to run concurrently; |
| | Conspiracy to Import (2) | Guilty | 3 years special parole on count 9; |
| | Substantive Narcotics Distribution (9) | Guilty | $20,000 on each count |
| | Use of telephone to facilitate a narcotics felony (20–21) | Not Guilty | |
| | Use of telephone to facilitate a narcotics felony (22) | No verdict | |
| | Carrying a firearm during crime of violence (27) | Dismissed | |
| Peter Pazienza | Conspiracy to Distribute (1) | Guilty | 4 years on each count to run concurrently; |
| | Conspiracy to Import (2) | Guilty | $50 special assessment on each count |
| Ayman S. Rabadi | Conspiracy to Distribute (1) | Guilty | 5 years on each count to run concurrently; |
| | Conspiracy to Import (2) | Guilty | $50 special assessment on each count |